[L.A. No. 30485. June 28, 1976.]

MARY ELLEN CRAWFORD, a Minor, etc., et al.,
Plaintiffs and Respondents, v.
BOARD OF EDUCATION OF THE CITY OF LOS ANGELES,
Defendant and Appellant.

**COUNSEL**

John H. Larson and John D. Maharg, County Counsel, Alfred Charles De Flon, Deputy County Counsel, and Jerry F. Halverson for Defendant and Appellant.

Ralph D. Stern, Donald R. Lincoln, Paul D. Engstrand and Jennings, Engstrand & Henrikson as Amici Curiae on behalf of Defendant and Appellant.

Bayard F. Berman, William T. Rintala, Peter C. Smoot, Michael Bergman, Sheldon J. Weisel and Fred Okrand for Plaintiffs and Respondents.

Daniel M. Luevano, Rosalyn M. Chapman, Philip L. Goar, John E. McDermott, Mary S. Burdick, Howard S. Smith, Howard I. Friedman, Sidney J. Machtinger, Herbert A. Bernhard, Maxwell E. Greenberg, Harold Horowitz, Laurence R. Sperber, Stanley W. Levy, Bertram K. Massing, Walter S. Hilborn, David Ziskind, Robert Weil, Jack Levine, Allan J. Greenberg, William G. Israel, Nathan L. Schoichet, Charles B. Johnson and Joan L. Freeman as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**TOBRINER, J.**—Thirteen years ago, in *Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876 [31 Cal.Rptr. 606, 382 P.2d 878] (hereinafter *Jackson*) this court, in a unanimous decision authored by then Chief Justice Gibson, explicitly declared that "[t]he segregation of school children into separate schools because of their race, even though the physical facilities and the methods and quality of instruction in the several schools may be equal, deprives the children of the minority group of equal opportunities for education and denies them equal protection and due process of the law." (*Id.*, at p. 880.) We held that as a consequence school boards in this state bear a constitutional obligation to undertake reasonably feasible steps to alleviate such racial segregation in the public schools, *regardless of the cause of such segregation.* (*Id.*, at p. 881.)

In the instant case, the trial court found that although the schools of the Los Angeles Unified School District were severely segregated and were becoming increasingly segregated, the defendant school board had failed to take any steps to attempt to alleviate the segregated condition, and indeed, had taken affirmative acts which contributed to and perpetuated the racial and ethnic segregation in its school system. On the

basis of these findings, the court ordered the defendant school board to prepare and implement a reasonably feasible plan for the desegregation of its schools.

The defendant school board appeals from the trial court judgment, contending primarily that the segregated condition of its district's schools should properly be characterized as "de facto" rather than "de jure" and that it owes no constitutional duty to alleviate such de facto school segregation. The findings in this case adequately support the trial court's conclusion that the segregation in the defendant school district is de jure in nature. We shall explain, however, that we do not rest our decision on this characterization because we continue to adhere to our conclusion in *Jackson* that school boards in California bear a constitutional obligation to take reasonably feasible steps to alleviate school segregation "regardless of its cause." (59 Cal.2d at p. 881.) Consequently, the trial court's finding that the schools in the Los Angeles Unified School District are segregated, together with its conclusion that the defendant school board has failed to undertake reasonably feasible steps to desegregate its schools, are sufficient to sustain the trial court's order compelling the school board to prepare and implement a plan which attempts to alleviate the segregation and the traditional harmful effects of segregation in its district's schools.

While we affirm the trial court's order requiring the defendant board to prepare and implement a reasonably feasible desegregation plan, we shall point out that one portion of the judgment, defining "segregated" schools in terms of specific racial and ethnic percentages, is in error and must be modified on remand. Moreover, although no specific desegregation plan is presently before this court, we have concluded that in light of the crucial importance of the remedial aspects of the school desegregation problem and the considerable confusion that prevails as to the nature of a school district's constitutional obligations, we should attempt to clarify the scope of the school board's constitutional duty in this area. As we explain, the Constitution does not require a school board to achieve a particular or identical "racial mix" or "racial balance" in each school; rather, the constitutional evil inheres in the existence of *segregated* schools. It is the elimination of such segregation and the harms inflicted by such segregation that is the ultimate constitutional objective.

Furthermore, as our decision in *Jackson* indicated, a school board fulfills its constitutional obligation in this area so long as it undertakes

reasonably feasible steps to alleviate segregation and its accompanying harm. The past decade has produced literally scores of alternative administrative techniques which may be utilized to facilitate school desegregation, but the success of alternative programs has varied markedly in practice, in terms of both the actual number of students who ultimately attend desegregated schools and the quality of the integrated educational programs that the affected school children receive. Experience has taught that the task of integration is an extremely complex one which entails much more than the assignment of specified percentages of pupils of different races or ethnic groups to the same school.

In light of the realities of the remedial problem, we believe that once a court finds that a school board has implemented a program which promises to achieve meaningful progress toward eliminating the segregation in the district, the court should defer to the school board's program and should decline to intervene in the school desegregation process so long as such meaningful progress does in fact follow. A court should thus stay its hand even if it believes that alternative techniques might lead to more rapid desegregation of the schools. We have learned that the fastest path to desegregation does not always achieve the consummation of the constitutional objective; it may instead result in resegregation. In the absence of an easy, uniform solution to the desegregation problem, plans developed and implemented by local school boards, working with community leaders and affected citizens, hold the most promising hope for the attainment of integrated public schools in our state.

In those instances, however, in which a court finds that a local school board has not embarked upon a course of action designed to eliminate segregation in its schools or, having done so, has not implemented a plan that provides meaningful progress toward that goal, a court has no alternative but to intervene and to order the school board to undertake immediately a reasonably feasible desegregation program. Under such circumstances, a trial court retains broad equitable power to order implementation of a realistic program which it believes will ensure meaningful progress to alleviate school segregation in the district.

1. *The facts of the instant case.*

Plaintiffs, minority children attending school in the Los Angeles Unified School District, filed this class action on August 1, 1963, just a

few months after this court's decision in *Jackson* v. *Pasadena City School Dist., supra.* For several years thereafter the case remained relatively dormant, as plaintiffs sought to convince the school board to begin voluntarily the process of preparing and implementing a master plan for the eventual desegregation of the Los Angeles school district. When these efforts proved futile, the trial began in October 1968 and continued intermittently for 65 court days, finally concluding in May 1969. A tremendous quantity of evidentiary material was introduced in the course of the lengthy trial; the reporter's transcript on appeal runs to 62 volumes. After reviewing this weighty evidence, the trial court in May 1970 issued its lengthy findings of fact, conclusions of law, judgment and peremptory writ of mandate, essentially granting plaintiffs the relief they had sought.

The trial court initially found that the public schools in the Los Angeles Unified School District were, in fact, substantially segregated and, over the 1966 to 1968 period for which statistics were available, had become increasingly segregated. Although the precise extent of the segregation in the Los Angeles school district varies, depending upon how one defines "segregated school,"[1] the statistical evidence before the trial court reveals that in 1968 a substantial proportion of the district's schools had student populations of either 90 percent or more minority students or 90 percent or more white students.[2] In light of the fact that the composition of the student population attending the district's schools

---

[1] As we explain, *infra*, a "segregated" school cannot be defined solely in terms of the racial composition of its student body: other factors, such as the racial composition of faculty and administration, and community and school board attitudes toward the school, have a place in such a determination. The trial court, rendering its findings many years before recent court decisions, defined a "segregated school" in defendant's district as a "school whose pupil enrollment consists of substantially more than 49 percent of minorities, or any one thereof, or substantially more than fifty percent whites"; we do not follow such an approach. Recent decisions demonstrate that the trial court was correct, however, in treating blacks and Mexican Americans as similarly disadvantaged minorities and in evaluating the segregation in the district in terms of "minority segregated" schools. (See, e.g., *Keyes* v. *School District No. 1, Denver, Colo.* (1973) 413 U.S. 189, 197-198 [37 L.Ed.2d 548, 556-557, 93 S.Ct. 2686] (hereinafter *Keyes*).)

[2] For example, of the 80 elementary schools which had enrollments of over 50 percent black students, 72 had enrollments of over 90 percent black: of the 15 junior high schools which were predominantly black, 13 had black populations of 90 percent or more: of the 9 "majority black" high schools, 7 had black student populations exceeding 90 percent.

Although the record does not contain any recent statistical data on the demography of the Los Angeles Unified School District, a 1971 "Enrollment Survey" conducted by the federal Department of Health, Education and Welfare, found that the Los Angeles school district was among the most segregated in the entire country, with 86.6 percent of black pupils attending schools which were more than 80 percent black. (See 118 Cong. Rec. 565 (1972).)

in 1968 was approximately 50 percent minority and 50 percent white,[3] there is little question on the present record that the defendant school district was at that time substantially segregated. (Cf. *Keyes, supra,* 413 U.S. 189, 206 [37 L.Ed.2d 548, 562].) Indeed, the school board does not challenge the trial court's finding of substantial segregation in the district's schools.

The trial court also found that throughout the relevant time period—which ran through the conclusion of the trial in May 1969—the defendant school board had not taken steps either to devise or to implement a reasonably feasible program which would attempt to alleviate the segregated condition of its district's schools. The court noted that although the severely segregated nature of the district's schools had been repeatedly brought to the board's attention, the board had refused "even [to commence] an in-depth study so as to enable it to evolve any . . . plan" for the desegregation of its schools. Again the board does not seriously dispute this finding, but explains its failure to attempt to devise any comprehensive desegregation strategy on the ground that the board and the district staff were not, and are not, convinced that the educational value, if any, of a desegregation program outweighs the detriment, in terms of financial cost, that such a program would entail.

In addition to the board's failure to devise or implement any plan to attempt to alleviate the segregation existing in the district's schools, the trial court specifically found that the board "has . . . since at least May of 1963, knowingly, affirmatively and in bad faith . . . by and through its affirmative policies . . . and practices, . . . segregated, *de jure,* its students. . . ." The court based this finding on a number of affirmative actions which the board had taken over the relevant period with the knowledge that such acts would create and perpetuate segregated education within the district.

The specific items detailed in the court's findings include (1) the siting and construction of new schools in such locations and of such size that, in light of the school board's "neighborhood school" assignment policy, inevitably led such schools to be heavily segregated upon opening; (2) the implementation of an "open transfer" policy that permitted students to transfer out of their neighborhood schools so long as the transferring student would provide his own transportation to the new school, with

[3]According to the record, in 1968 the racial and ethnic breakdown of the students in the defendant school district was as follows: 20 percent Mexican American, 22.6 percent black, 3.6 percent Oriental, 0.2 percent American Indian and 53.6 percent white.

knowledge that such a policy would exacerbate school segregation because it would permit the more affluent white students to transfer out of minority segregated schools but at the same time could not be utilized by less affluent minority students to transfer into predominantly white schools; (3) the establishment of "feeder school" policies, by which the student population of the district's junior high and high schools are determined, which it knew or should have known would create and perpetuate segregation in such higher grade schools; and (4) the establishment of "mandatory attendance areas and boundaries around its neighborhood schools so as to create or perpetuate segregated schools. . . ."

The court also found, on the basis of extensive evidentiary material provided by the plaintiffs at trial, that minority children suffer serious harm when their education takes place in segregated public schools and that such harm is equally present whether such segregation is de jure or de facto in nature. Finally, the trial court determined that in the Los Angeles school district "the plant, teachers, physical facilities and curriculum at . . . [the district's] minority segregated schools are in fact of poorer quality than the plant, teachers, physical facilities and curriculum at its predominantly white schools."

On the basis of these findings, and its additional determination that the defendant board would not, without a court order, formulate and adopt a bona fide plan for the desegregation of its district's schools, the court ordered the board to evolve and adopt a meaningful desegregation plan "that will realistically work within a reasonable period of time, having for its aim, purpose and object a racially non-discriminatory unitary school system. . . ." Defendant school board appeals from the trial court judgment.

2. ■■■ *As declared in Jackson v. Pasadena City School Dist., California school boards bear a constitutional obligation to take reasonably feasible steps to alleviate school segregation, whether such segregation is de jure or de facto in nature.*

As noted above, the defendant school board generally concedes that its district's schools are, in fact, substantially segregated, and that it has not prepared or implemented any general plan to attempt to alleviate such segregation. The board contends, however, that the segregation in its schools is de facto in origin, and therefore, that it bears no constitutional obligation to take any steps to attempt to alleviate the concededly

racially and ethnically segregated status of its schools. In this regard, the school board relies heavily upon several recent decisions of the United States Supreme Court, which it contends establish that school districts have no constitutional duty to remedy de facto school segregation.

As we read these recent federal cases, the issue as to whether school districts have an obligation under the *federal* Constitution to avoid the perpetuation of purely de facto school segregation remains an open question.[4] In focusing primarily on these federal decisions, however, defendant ignores a significant line of California decisions, decisions which authoritatively establish that in this state school boards do bear a constitutional obligation to take reasonable steps to alleviate segregation in the public schools, whether the segregation be de facto or de jure in origin.

*Jackson* v. *Pasadena City School Dist., supra,* 59 Cal.2d 876 is, of course, the seminal decision in this line of cases. In *Jackson,* a minority student instituted an action against the Pasadena school district alleging that the board had gerrymandered one of its high school boundary attendance zones to perpetuate the largely segregated character of the school's student body. After finding that such intentional discrimination was unquestionably unconstitutional, Chief Justice Gibson, writing for a unanimous court, went on to make clear that the constitutional obligations of school boards in this state entail more than simply the avoidance of such intentionally invidious conduct.

---

[4] In several recent opinions the United States Supreme Court has adverted to the de facto-de jure distinction (see *Swann* v. *Board of Education* (1971) 402 U.S. 1, 17-18 [28 L.Ed.2d 554, 567-568, 91 S.Ct. 1267] (hereinafter *Swann*); *Keyes, supra,* 413 U.S. at p. 208 [37 L.Ed.2d at p. 563]) and has limited remedial measures which sought to involve independent school districts as to which no findings of de jure segregation had been made. (See *Milliken* v. *Bradley* (1974) 418 U.S. 717, 745-747 [41 L.Ed.2d 1069, 1091-1092, 94 S.Ct. 3112].) The court has never directly held, however, that a school district is constitutionally free to ignore the segregative consequences of adhering to "neutral," facially nondiscriminatory policies, and in *Keyes* itself the court explicitly declared: "We have no occasion to consider in this case whether a 'neighborhood school policy' of itself will justify racial or ethnic concentrations in the absence of a finding that school authorities have committed acts constituting *de jure* segregation." (413 U.S. at p. 212 [37 L.Ed.2d at p. 565].)

Indeed, as Justice Powell's concurrence in *Keyes* convincingly explains (see 413 U.S. at pp. 220-232 [37 L.Ed.2d at pp. 569-577]), the approach taken by the United States Supreme Court in school desegregation cases beginning with *Green* v. *County School Board* (1968) 391 U.S. 430 [20 L.Ed.2d 716, 88 S.Ct. 1689] cannot be easily reconciled with a constitutional doctrine which differentiates de jure and de facto segregation. (See also Karst & Horowitz, *Emerging Nationwide Standards for School Desegregation—Charlotte and Mobile, 1971* (1971) 1 Black L.J. 206; Goodman, *De Facto School Segregation: A Constitutional and Empirical Analysis* (1972) 60 Cal.L.Rev. 275, 295-298.)

Our decision in *Jackson* declared: "Although it is alleged that the board was guilty of intentional discriminatory action, it should be pointed out that even in the absence of gerrymandering or other affirmative discriminatory conduct by a school board, a student under some circumstances would be entitled to relief where, by reason of residential segregation, substantial racial imbalance exists in his school. So long as large numbers of Negroes live in segregated areas, school authorities will be confronted with difficult problems in providing Negro children with the kind of education they are entitled to have. Residential segregation is in itself an evil which tends to frustrate the youth in the area and to cause antisocial attitudes and behavior. *Where such segregation exists it is not enough for a school board to refrain from affirmative discriminatory conduct. The harmful influence on the children will be reflected and intensified in the classroom if school attendance is determined on a geographic basis without corrective measures. The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause.*" (Italics added.) (59 Cal.2d at p. 881.)

Although this language as to a California school board's obligation with respect to de facto segregation could hardly be clearer, defendant attempts to avoid the mandate of this passage by characterizing the quoted portion of the decision as "mere dictum." While in a technical sense the foregoing passage may not have been strictly necessary to the judgment in *Jackson,* a subsequent line of decisions of this court demonstrate beyond dispute that the principles articulated by Chief Justice Gibson in *Jackson* have been accepted as established constitutional law in this state.

In *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 537 [50 Cal.Rptr. 881, 413 P.2d 825], for example, we described the *Jackson* holding in the following terms: "[I]n *Jackson* v. *Pasadena City School Dist., supra,* . . . the state, because it had undertaken through school districts to provide educational facilities to the youth of the state, was required to do so in a manner which avoided segregation and unreasonable racial imbalance in its schools."

Subsequently, in *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 957-958 [92 Cal.Rptr. 309, 479 P.2d 669] (hereinafter *Johnson*), we spoke to *Jackson*'s treatment of the de jure-de facto distinction even more directly, stating: "We recognize that the courts of

other jurisdictions have reached differing decisions as to whether school boards bear an affirmative duty to eliminate de facto segregation. This court, in *Jackson* v. *Pasadena City School Dist. . . .* , however, took a position squarely in favor of enforcing an affirmative duty to eradicate school segregation regardless of its cause." (Fn. omitted.)

Finally, in analyzing an argument seeking to justify de facto wealth discrimination in the public school system in *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 603 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], we explained: "[S]uch discrimination cannot be justified by analogy to de facto *racial* segregation. Although the United States Supreme Court has not yet ruled on the constitutionality of de facto racial segregation, this court eight years ago held such segregation invalid, and declared that school boards should take affirmative steps to alleviate racial imbalance, however created. [Citing *Jackson*.] Consequently, any discrimination based on wealth can hardly be vindicated by reference to de facto racial segregation, which we have already condemned."

As these decisions demonstrate, since *Jackson* this court has consistently reiterated the principle that the constitutional obligations of school boards in California include an obligation to undertake reasonably feasible steps to alleviate school segregation, regardless of its cause. Contrary to defendant's contention, nothing in this court's recent decision in *Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315 [118 Cal.Rptr. 637, 530 P.2d 605] (hereinafter *Santa Barbara*) can properly be interpreted as either a retreat from, or repudiation of, the *Jackson* decision. In *Santa Barbara* we considered, inter alia, the constitutionality of an initiative provision which purported (1) to prohibit all busing to attain racial integration, and (2) to repeal several statutory and administrative provisions which required school districts to achieve specific "racial balance" quotas in their schools. We held initially that the prohibition of busing was unconstitutional as applied either to de jure or de facto segregated school districts, explicitly reaffirming our earlier decision in *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937. At the same time, however, we upheld the validity of the second half of the initiative, emphasizing that insofar as the specific statutory racial balance quotas were not constitutionally mandated, they were subject to repeal.

Although defendant argues that this latter holding conflicts with *Jackson,* that conclusion cannot stand. In *Jackson* we held that local

school boards have an affirmative obligation to take reasonably feasible steps to alleviate school segregation, whatever its cause; in *Santa Barbara* we simply held that *insofar as specific racial percentages were not constitutionally compelled,* such quotas could be repealed. Indeed, in *Santa Barbara* we were careful to emphasize explicitly that our decision upholding the repeal of the specific racial balance quotas would "in no way limit or affect the constitutional obligations of school districts . . . ." (13 Cal.3d at p. 330.)[5]

Thus, as we have seen, for more than a decade this court has adhered to the position that school boards in this state bear a constitutional obligation to attempt to alleviate school segregation, regardless of its cause. Although defendant urges our court, at this late date, to abandon this constitutional interpretation, we remain convinced of the soundness of our prior decisions, both as to the principle itself and as to the practical consequences that would follow if our court were now to embrace defendant's suggested de facto-de jure distinction.

[5]In contending that it has no duty to alleviate de facto segregation, defendant also relies upon language contained in the Court of Appeal decision in *People* ex rel. *Lynch* v. *San Diego Unified School Dist.* (1971) 19 Cal.App.3d 252 [96 Cal.Rptr. 658] (hereinafter *Lynch*). In *Lynch*, the California Attorney General had sought a writ of mandate directing the San Diego Unified School District "to take reasonably feasible steps to prevent, alleviate and eliminate racial imbalance in its schools," and the trial court sustained defendant's demurrer and dismissed the action. The Court of Appeal reversed, interpreting our *Jackson* decision as requiring districts to alleviate "racial imbalance" "where the imbalance denies the minority group equal educational opportunities." (19 Cal.App.3d at p. 265.) In reaching this conclusion, the *Lynch* court also indicated that "[t]he action of school authorities in maintaining de facto *racially imbalanced* public schools is not a denial of equal protection of the law unless the imbalance denies the minority group equal educational opportunities." (Italics added.) (*Id.*)

Although the *Lynch* opinion was concerned only with "racial imbalance" and not the more severe condition of de facto segregation, defendant characterizes *Lynch* as holding that school districts have no duty to attempt to alleviate de facto segregation if the district's segregated schools are "separate but equal." In the first place, even if this rendition were a proper reading of *Lynch* and *Jackson* it would provide defendant no comfort in the instant case since the trial court explicitly found that the minority segregated schools in defendant's district were "separate and unequal." More fundamentally, however, we reject defendant's suggestion that our *Jackson* decision implicitly embodies a reincarnation of the discredited "separate but equal" doctrine of *Plessy* v. *Ferguson* (1896) 163 U.S. 537 [41 L.Ed. 256, 16 S.Ct. 1138]. Although in *Jackson* we did recognize that a school board, in meeting its obligation to attempt to alleviate segregation and its harmful effects, might appropriately make special efforts to provide equal educational opportunities to its minority students, this court did not indicate that a school board's duty to take affirmative action only came into play upon a showing that the facilities in the district's schools were in fact unequal. Instead, we explicitly declared: "Where [residential] segregation exists, it is not enough for a school board to refrain from affirmative discriminatory conduct." (59 Cal.2d at p. 881.)

■ To begin with, wherever the origins or causes of school segregation may lie, we do not doubt that, under traditional constitutional doctrine, local school boards are so "significantly involved" in the control, maintenance and ongoing supervision of their school systems as to render any existing school segregation "state action" under our state constitutional equal protection clause. In California, school boards possess plenary authority to determine school assignment policies; to establish and reestablish geographic attendance zones; to determine where new schools will be built, what their size will be and what "neighborhood" they will serve; to create or eliminate transfer options between schools; and to establish specialized programs that may attract particular students to particular schools. Given the school board's pervasive control over and continuing responsibility for both the daily decisions and the long range plans which in fact determine the racial and ethnic attendance pattern of its district's schools, past authorities demonstrate that the state cannot escape constitutional responsibility for the segregated condition of the public schools. (See, e.g., *Santa Barbara, supra,* 13 Cal.3d 315, 329; *Johnson, supra,* 3 Cal.3d 937, 951-952; *Jackson, supra,* 59 Cal.2d 876, 879; accord *Adams* v. *Department of Motor Vehicles* (1974) 11 Cal.3d 146, 152-153 [113 Cal.Rptr. 145, 520 P.2d 961, 64 A.L.R.3d 803]; *United States* v. *Texas Education Agency* (5th Cir. 1972) 467 F.2d 848, 863-864; cf. *Burton* v. *Wilmington Pkg. Auth.* (1961) 365 U.S. 715, 722-725 [6 L.Ed.2d 45, 50-52, 81 S.Ct. 856].)[6]

Moreover, although a school board's establishment of and adherence to a "neighborhood school policy" may on its face represent the implementation of a "neutral," constitutionally permissible classification scheme, the effect of such state action has invariably been to inflict a "racially specific" harm on minority students when such a policy actually results in segregated education.

---

[6]As Justice Powell has observed: "Public schools are creatures of the State, and whether the segregation is state-created or state-assisted or merely state-perpetuated should be irrelevant to constitutional principle. The school board exercises pervasive and continuing responsibility over the long-range planning as well as the daily operations of the public school system. It sets policies on attendance zones, faculty employment and assignments, school construction, closings and consolidations, and myriad other matters. School board decisions obviously are not the sole cause of segregated school conditions. But if, after such detailed and complete public supervision, substantial school segregation still persists, the presumption is strong that the school board, by its acts or omissions, is in some part responsible. Where state action and supervision are so pervasive and where, after years of such action, segregated schools continue to exist within the district to a substantial degree, this Court is justified in finding a prima facie case of a constitutional violation." (*Keyes, supra,* 413 U.S. at pp. 227-228 [37 L.Ed.2d at p. 574] (Powell, J. concurring).)

In *Brown* v. *Board of Education* (1954) 347 U.S. 483, 493 [98 L.Ed. 873, 880, 74 S.Ct. 686, 38 A.L.R.2d 1180], the United States Supreme Court framed the crucial question before it in the following terms: "Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities?" The court's answer: "We believe that it does." (*Id.*) The decision in *Brown* was, of course, rendered in the context of an explicit state policy requiring racial segregation in schools. As this court discussed at some length in *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937, 949-950, however, the *Brown* court's conclusion that "[s]eparate educational facilities are inherently unequal" (347 U.S. at p. 495 [98 L.Ed. at p. 881]) has traditionally been true of de facto segregated schools as well as de jure segregated schools.

In *Johnson* we quoted at length from a comprehensive study by the United States Commission on Civil Rights[7] and noted that the findings of the commission as to the harm inflicted on minority children *"do not, of course, turn on whether the segregation is of de facto or de jure character; it is the presence of racial isolation, not its legal underpinnings, that creates unequal education."* (Italics added.) (3 Cal.3d at p. 949.) As the commission staff itself concluded: "The central truth which emerges from this report and from all of the Commission's investigations is simply this: Negro children suffer serious harm when their education takes place in public schools which are racially segregated, whatever the source of such segregation may be. . . ." (U.S. Com. on Civ. Rights, Racial Isolation in the Public Schools (1967) p. 193.)

[7]As we noted in *Johnson*, in its publication "Racial Isolation in the Public Schools" the commission offered the following explanation for its conclusion that black children suffer special harm when their education occurs in segregated schools: " 'The environment of schools with a substantial majority of Negro students . . . offers serious obstacles to learning. The schools are stigmatized as inferior in the community. The students often doubt their own worth, and their teachers frequently corroborate these doubts. The academic performance of their classmates is usually characterized by continuing difficulty. The children often have doubts about their chances of succeeding in a predominately white society and they typically are in school with other students who have similar doubts. They are in schools which, by virtue of both their racial and social class composition, are isolated from models of success in school.'

"The commission went on to note that 'racial isolation in the schools . . . fosters attitudes and behavior that perpetuate isolation in other important areas of American life. Negro adults who attend racially isolated schools are more likely to have developed attitudes that alienate them from whites. White adults with similarly isolated backgrounds tend to resist desegregation in many areas—housing, jobs, and schools.' " (3 Cal.3d at p. 949.)

The harms traditionally inflicted on minority children by school segregation do not, of course, relate solely to objective measures of academic achievement. Although from the existing evidence it appears that, by and large, the maintenance of segregated education probably does disproportionately impede the achievement of minority students vis-a-vis majority students,[8] the detriments traditionally identified with segregated education rest in significant part outside of the academic sphere. In both *Brown* and in numerous pre-*Brown* decisions, the United States Supreme Court emphasized the less measurable psychological and sociological burdens traditionally imposed on minority children when the public schools afford them education only in an isolated setting, apart from students who make up a majority of the nation's population.

In rejecting an attempt by the State of Texas to justify the maintenance of racially segregated law schools on the basis of the "separate but equal" doctrine in *Sweatt* v. *Painter* (1950) 339 U.S. 629, 634 [94 L.Ed. 1114, 1119, 70 S.Ct. 848], for example, the Supreme Court observed that "[t]he law school, the proving ground for legal learning and practice, cannot be effective in isolation from the individuals and institutions with which the law interacts. . . . The law school to which Texas is willing to admit petitioner excludes from its student body members of the racial groups which number 85 percent of the population of the State and include most of the lawyers, witnesses, jurors, judges and other officials with whom petitioner will inevitably be dealing when he becomes a member of the Texas Bar. With such a substantial and significant segment of society excluded, we cannot conclude that the education offered petitioner is substantially equal to that which he would receive if admitted to the University of Texas Law School." (See also *McLaurin* v. *Oklahoma State Regents* (1950) 339 U.S. 637 [94 L.Ed. 1149, 70 S.Ct. 851].) A similar observation could be made as to the Los Angeles public school system.

■ In light of the detrimental consequences that segregated schools have traditionally imposed on minority children, and a school board's plenary authority over the governance of its schools, a school board in this state is not constitutionally free to adopt any facially neutral policy it chooses, oblivious to such policy's actual differential impact on the minority children in its schools. As recent California decisions concerning the constitutional obligations of state officials have held, public

[8]See generally Weinberg, *The Relationship Between School Desegregation and Academic Achievement: A Review of the Research* (1975) 39 Law & Contemp. Prob. 241; St. John, School Desegregation: Outcomes for Children (1975) pages 16-41.

officials in some circumstances bear an affirmative obligation to design programs or frame policies so as to avoid discriminatory results. Thus, in defining the duties of officials in compiling jury lists and selecting jury panels, in *People* v. *Superior Court (Dean)* (1974) 38 Cal.App.3d 966, 972 [113 Cal.Rptr. 732], for example, the Court of Appeal cautioned that: "[O]fficial compilers of jury lists may drift into discrimination by not taking affirmative action to prevent it. In formulating a panel for a grand jury endowed with the criminal indictment function, *officials must adhere to a standard more stringent than mere abstension from intentional discrimination; they have an affirmative duty to develop and pursue procedures aimed at achieving a fair cross-section of the community."* (Italics added.) (See also *People* v. *Spears* (1975) 48 Cal.App.3d 397, 402 [122 Cal.Rptr. 93]; accord *Avery* v. *Georgia* (1953) 345 U.S. 559, 561 [97 L.Ed. 1244, 1247, 73 S.Ct. 891]; *Smith* v. *Texas* (1940) 311 U.S. 128, 132 [85 L.Ed. 84, 87, 61 S.Ct. 164].)

 Finally, the importance of adopting and implementing policies which avoid "racially specific" harm to minority groups takes on special constitutional significance with respect to the field of education, because, at least in this state, education has been explicitly recognized for equal protection purposes as a "fundamental interest." (See *Serrano* v. *Priest, supra,* 5 Cal.3d 584, 604-610; cf. *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 [36 L.Ed.2d 16, 93 S.Ct. 1278].) Indeed, as we emphasized in *Serrano,* the "fundamental" nature of the right to an equal education derives in large part from the crucial role that education plays in "preserving an individual's opportunity to compete successfully in the economic marketplace, despite a disadvantaged background. . . . [T]he public schools of this state are the bright hope for entry of the poor and oppressed into the mainstream of American society." (5 Cal.3d at p. 609.) Given the fundamental importance of education, particularly to minority children, and the distinctive racial harm traditionally inflicted by segregated education, a school board bears an obligation, under article I, section 7, subdivision (a) of the California Constitution, mandating the equal protection of the laws, to attempt to alleviate segregated education and its harmful consequences, even if such segregation results from the application of a facially neutral state policy. (See *Serrano* v. *Priest, supra,* 5 Cal.3d at pp. 602-603; cf. *In re Antazo* (1970) 3 Cal.3d 100 [89 Cal.Rptr. 255, 473 P.2d 999]; *Gould* v. *Grubb* (1975) 14 Cal.3d 661, 674-675 [122 Cal.Rptr. 377, 536 P.2d 1337].)

Moreover, *Jackson*'s conclusion that school boards in this state must take steps to alleviate school segregation, however caused, is not only

required by application of state equal protection principles, but, in addition, by consideration of the deleterious practical consequences that would inevitably flow from our adoption of the de jure-de facto distinction. As we explain, the practical difficulties stem from a number of considerations.

We begin with the difficulties that would be encountered in attempting to distinguish de facto from de jure segregated schools. Initially we confront the problem of definition for, as we observed in our *Johnson* and *Santa Barbara* decisions, "[t]he courts have not drawn a clear distinction between de facto and de jure segregation." (3 Cal.3d at p. 956; 13 Cal.3d at p. 325.) Although recent decisions have defined de jure segregation as a "current condition of segregation resulting from intentional state action," (*Keyes, supra,* 413 U.S. at p. 205 [37 L.Ed.2d at pp. 561-562]), disputes continue to persist as to whether the "intent" of a school board is to be judged on the basis of the objective effects of its actions or the basis of the subjective motives of its members.[9]

More significantly, even if it were possible to arrive at a definition distinguishing de jure from de facto segregation, the factual inquiries which would inevitably arise in the judicial application of such a definition would be unending. As Justice Powell has pointed out, if significant constitutional consequences are to turn on whether school segregation is de jure or de facto "[e]very act of a school board and school administration, and indeed every failure to act where affirmative action is indicated, must . . . be subject[ed] to scrutiny. The most routine decisions with respect to the operation of schools, made almost daily, can affect in varying degrees the extent to which schools are initially segregated, remain in that condition, are desegregated, or—for the long term future—are likely to be one or the other. These decisions include action or nonaction with respect to school building construction and location; the timing of building new schools and their size; the closing and consolidation of schools; the drawing or gerrymandering of student attendance zones; the extent to which a neighborhood policy is enforced;

[9]Compare *Hart* v. *Community School Bd. of Ed., N. Y. Sch. Dist. #21* (2d Cir. 1975) 512 F.2d 37, 50; *United States* v. *School District of Omaha* (8th Cir. 1975) 521 F.2d 530, cert. den., 423 U.S. 946 [46 L.Ed.2d 280, 96 S.Ct. 361]; *Morgan* v. *Kerrigan* (1st Cir. 1974) 509 F.2d 580, 585, 586, cert. den., 421 U.S. 963 [44 L.Ed.2d 449, 95 S.Ct. 1950]; *Oliver* v. *Michigan State Board of Education* (6th Cir. 1974) 508 F.2d 178, 182, cert. den., 421 U.S. 963 [44 L.Ed.2d 449, 95 S.Ct. 1950] and *United States* v. *Board of Sch. Com'rs. of Indianapolis, Ind.* (7th Cir. 1973) 474 F.2d 81, 84-85, cert. den., 413 U.S. 920 [37 L.Ed.2d 1041, 93 S.Ct. 3066] with *Johnson* v. *San Francisco Unified School District* (9th Cir. 1974) 500 F.2d 349, 351-352.

the recruitment, promotion and assignment of faculty and supervisory personnel; policies with respect to transfers from one school to another; whether, and to what extent, special schools will be provided, where they will be located, and who will qualify to attend them; the determination of curriculum, including whether there will be 'tracks' that lead primarily to college or to vocational training, and the routing of students into these tracks; and even decisions as to social, recreational and athletic policies." (*Keyes, supra,* 413 U.S. at pp. 234-235 [37 L.Ed.2d at p. 578] (Powell, J., concurring).)

Further, the difficulty of the judicial task is exacerbated by the fact that the judicial scrutiny cannot be confined "to [school board] actions in the immediate present . . . [but must encompass] the full history of acts by the school authorities . . . ." (*Santa Barbara, supra,* 13 Cal.3d at pp. 326-327; see *Keyes, supra,* 413 U.S. at pp. 210-211 [37 L.Ed.2d at pp. 564-565].) As we observed in *Johnson:* "The weighing of the motive and effect of board decisions stretching back for many years to arrive at a net determination of the de facto or de jure character of the present structure presents a highly difficult and possibly insoluble task." (3 Cal.3d at p. 957.)

Moreover, the difficulty of categorizing districts as de facto or de jure is aggravated by the fact that actions of state entities other than school boards must also be scrutinized to determine whether such conduct has significantly contributed to racially segregated residential patterns. In many instances, for example, such residential patterns "may be in part the product of unconstitutional enforcement of restrictive racial covenants" (*Johnson, supra,* 3 Cal.3d at p. 956); in other instances, segregated housing patterns may be linked to a long-standing policy of the Federal Housing Administration which discouraged the development of "mixed," i.e., integrated, neighborhoods out of fear that such neighborhoods were economically unstable. (See 1938, FHA Underwriting Manual, § 980(3)(g).)[10]

---

[10]Numerous decisions have recognized the role such public housing decisions have played in the establishment of racial segregation in our cities and suburban areas. (See, e.g., *United States* v. *School District of Omaha, supra,* 521 F.2d 530, 534; *Morgan* v. *Kerrigan* (D.Mass. 1974) 379 F.Supp. 410, 471-472, affd. (1st Cir. 1974) 509 F.2d 580, cert. den., 421 U.S. 963 [44 L.Ed.2d 449, 95 S.Ct. 1950]; *United States* v. *Board of Sch. Com'rs., Indianapolis, Ind.* (S.D.Ind. 1971) 332 F.Supp. 655, 662-663, affd. (7th Cir. 1973) 474 F.2d 81, cert. den., 413 U.S. 920 [37 L.Ed.2d 1041, 93 S.Ct. 3066]; *Blackshear Res. Org.* v. *Housing Auth. of City of Austin* (W.D.Tex. 1971) 347 F.Supp. 1138, 1142-1143.)

Finally, the identification of de jure segregation would require an examination of the workings of the private housing market as well, for if minorities have been deprived of the opportunity to move into certain neighborhoods by private acts of discrimination, a school board's adoption and retention of a rigid neighborhood school policy would impermissibly grant to private individuals the power to exclude minority children from certain public schools simply by refusing to sell or rent homes to their families. (See Goodman, *De Facto School Segregation: A Constitutional and Empirical Analysis* (1972) 60 Cal.L.Rev. 275, 320-326.) As we explicitly declared in a similar context in *Johnson*: "A system that bestows governmental force upon a private decision to impose racial discrimination cannot stand." (3 Cal.3d at p. 953.)

Indeed, in light of a local school board's comprehensive control over the operation of its school district and the widespread role both public and private acts of discrimination have played in contributing to much of the current residential segregation (see Farley, *Residential Segregation and Its Implications for School Integration* (1975) 39 Law & Contemp. Prob. 164; Taeuber, *Demographic Perspectives on Housing and School Segregation* (1975) 21 Wayne L.Rev. 833), some jurists and commentators plausibly maintain that if sufficient scrutiny were applied to any school district exhibiting substantial segregation, some form of de jure segregation would be found. (See, e.g., *Keyes, supra,* 413 U.S. at pp. 252-253 [37 L.Ed.2d at pp. 588-589] (Powell, J., concurring); Karst & Horowitz, *Emerging Nationwide Standards for School Desegregation— Charlotte and Mobile, 1971* (1971) 1 Black L.J. 206, 218; Dimond, *Segregation, Northern Style* (1971) 9 Inequality in Ed. 17, 22-23.) And even if some segregated districts were, after a searching and complicated inquiry, classified de facto, such categorization would frequently be inconsistent with other judicial determinations on similar facts, for as Justice Powell has suggested, "wide and unpredictable differences of opinion among judges would be inevitable when dealing with an issue as slippery as 'intent' or 'purpose,' especially when related to hundreds of decisions made by school authorities under varying conditions over many years." (*Keyes, supra,* 413 U.S. at p. 233 [37 L.Ed.2d at p. 577] (Powell, J., concurring).)

Moreover, assuming it were possible for the courts confidently and consistently to distinguish de jure and de facto segregated school systems, the litigative task involved in such an effort would be an enormous one, imposing tremendous burdens on representatives of minorities, on school boards and on the courts. Such a protracted litigative process would, as it

has in the past, inevitably delay the desegregation of public schools throughout California for years to come.

In both our *Johnson* and *Santa Barbara* decisions, we pointed out that because of the difficulty in distinguishing de facto from de jure segregation, any ruling preserving these two categories "would inhibit and delay school boards in their efforts to bring about full equality of educational opportunity." (*Johnson, supra,* 3 Cal.3d at p. 957.) As we explained in *Santa Barbara:* "[In view of] the 'dilatory tactics of many school authorities' [in the past], . . . it is all too clear to us that the elimination of de jure segregation would be seriously impeded if school authorities could [justify their refusal to take any reasonably feasible steps to alleviate racial segregation] merely by asserting that the segregation in their district was de facto in origin." (13 Cal.3d at p. 327.) Thus, even though most of the currently segregated school systems in California would in all probability eventually be found to be de jure segregated, the immediate effect of a repudiation of the *Jackson* decision would be to delay efforts at desegregation.

Finally, and most fundamentally, even if courts could satisfactorily distinguish de facto from de jure segregation and even if the effect of such judicial effort would not provide a haven for intractable school boards, the judiciary must still face the ultimate reality that in California in the 1970's the de facto-de jure distinction retains little, if any, significance for the children whose constitutional rights are at issue here. Although the educational experts may disagree on many aspects of the desegregation controversy, there is virtually no dispute that the practical effect of segregated schooling on minority children does not depend upon whether a court finds the segregation de jure or de facto in nature; the isolating and debilitating effects do not vary with the source of the segregation.[11] Thus, the final blow against an adoption of the de facto-de jure distinction is that, as Justice Powell has pointed out, the distinction is simply "a legalism rooted in history rather than present reality." (*Keyes, supra,* 413 U.S. at p. 219 [37 L.Ed.2d at p. 569] (Powell, J., concurring).)

Accordingly, for all of the reasons discussed above, we adhere to this court's decision in *Jackson.* In California, all public school districts bear

[11]Even the "symbolic" harm, traditionally associated primarily with de jure segregation, does not provide a proper basis for constitutional distinction once it is recognized that "de jure" segregation frequently includes covert, innocently framed gerrymandering and more sophisticated forms of discrimination that are not explicitly written into a state's statute books.

an obligation under the state Constitution to undertake reasonably feasible steps to alleviate school segregation, regardless of the cause of such segregation. Thus, having found that the schools of the Los Angeles Unified School District were substantially segregated, and that the school board had not undertaken any efforts to attempt to alleviate such segregation, the court in the instant case properly ordered the board to prepare and implement a reasonably feasible desegregation plan.

3. ▮ *The function of the court is to ascertain if the school board has initiated a course of action to alleviate the effects of segregation in its schools and has made reasonable progress toward that goal; if the court so finds, it should not intervene; if it does not so find, it should intervene to protect the constitutional rights of minority children.*

Although no specific remedial desegregation plan is presently before our court, we believe, in light of some of the specific details of the trial court's order,[12] that we should attempt to clarify both the scope of a school board's obligations under *Jackson* and the proper role of the judiciary in implementing the constitutional principles at issue here.

▮ To begin with, the constitutional mandate articulated in *Jackson* and reaffirmed today is not a constitutional command that each school in a district must reflect the racial composition of the district as a whole.

---

[12]As noted above (fn. 1, *ante*), the trial court's memorandum opinion defines a "segregated school" as "a school whose pupil enrollment consists of substantially more than 49 percent of minorities, or any one thereof, or substantially more than 50 percent whites." In addition to this definition, the opinion sets out distinct definitions for the terms "integrated school," "racially balanced school" and "racially imbalanced school." The court concluded that "to constitute a racially integrated school in [defendant] District, the school's pupil enrollment must consist of not more than approximately 49 percent and not less than ten percent minority pupils, the remainder of the student body consisting of white pupils"; "to constitute a racially balanced school in [defendant] District, the school's pupil enrollment must consist of approximately the same racial proportions as exist in [the] District as a whole"; and "a racially imbalanced school, in [defendant] District, is a school whose pupil enrollment consists of substantially more of any one race or ethnic group than exists in [defendant] District as a whole."

The judgment entered by the trial court incorporates all these definitions and provides that the "Board shall integrate its schools in accordance therewith." Although the order is somewhat ambiguous as to whether the board's precise obligation is to eliminate "segregated schools," achieve "integrated schools" or provide "racially balanced schools," at one point the court's opinion characterizes the board's obligation as a duty "to use and exercise its powers and authority . . . so as to achieve, as closely as . . . good faith and fair dealing will reasonably enable and allow it to do, *integration* and *racial balance* in each of its schools so as to have a unitary school system." (Italics added.)

As we discuss, *infra*, in formulating the above definitions and in framing the board's obligation in terms of achieving "racial balance," the trial court erred.

(See *Jackson, supra,* 59 Cal.2d at p. 882; cf. *Swann, supra,* 402 U.S. at p. 24 [28 L.Ed.2d at p. 571]; *Wright* v. *Council of City of Emporia* (1972) 407 U.S. 451, 464 and fn. 12 [33 L.Ed.2d 51, 62-63, 92 S.Ct. 2196].)[13] As a matter of educational policy, of course, a program which aims at creating "racially balanced" schools which comprise microcosms of the school district population may well be a commendable goal; we emphasize, however, that we do not believe such racial or ethnic balance or even approximate racial or ethnic balance is required as a matter of constitutional law. Our decisions, instead, require only that school districts take reasonable and feasible steps to eliminate *segregated* schools, i.e., schools in which the minority student enrollment is so disproportionate as realistically to isolate minority students from other students and thus deprive minority students of an integrated educational experience. (Cf. *Green* v. *County School Board* (1968) 391 U.S. 430, 442 [20 L.Ed.2d 716, 726, 88 S.Ct. 1689] ("a system without a 'white' school and a 'Negro' school, but just schools").)[14] It is such segregated schools which traditionally have resulted in the inherently unequal educational opportunities condemned in *Brown.*[15]

Moreover, in determining whether a particular school is "segregated" for constitutional purposes, we do not believe set racial or ethnic percentages can be established, either in absolute terms or in terms of the racial composition of a particular district's student population. Under the

[13]Although our *Jackson* decision does, at one point, speak of a school board's duty to alleviate "racial imbalance," (59 Cal.2d at p. 881), in context it is clear that the "racial imbalance" phrase was not intended to indicate a constitutional obligation to "balance" all schools (see *id.,* at p. 882) but rather was used simply as a synonym for racial segregation.

[14]In neither this case, nor the companion *San Bernardino* case (*post* at p. 311 [130 Cal.Rptr. 744, 551 P.2d 48]) has any party suggested the propriety or necessity of implementing a "metropolitan plan" remedy that would involve the assignment of pupils outside of the particular school district in which they reside. (Cf. *Milliken* v. *Bradley, supra,* 418 U.S. 717.) Accordingly, we have not considered that issue and address only the question of an individual school board's duty with respect to the students within its own district.

[15]By defining a segregated school in terms of the isolation of minority students from other students, we in no way imply that an integrated educational experience benefits only minority students. We concur fully in the following observation of a respected federal judge: "Although the principal victims of a racially segregated education are the minority students, it is no less true that racially segregated schools inflict considerable harm on white students and society generally." (*Hart* v. *Community Sch. Bd. of Brooklyn, N. Y. Sch. D. #21* (E.D.N.Y. 1974) 383 F.Supp. 699, 740 (Weinstein, J.), affd. (2d Cir. 1975) 512 F.2d 37.) As we stated in *Johnson*: " '[T]he elimination of racial isolation in the schools promotes the attainment of equal educational opportunity and is beneficial to all students, both black and white.' " (3 Cal.3d at p. 950 (quoting *Lee* v. *Nyquist* (W.D.N.Y. 1970) 318 F.Supp. 710, 714).)

California Constitution, as under the federal Constitution, "[w]hat is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic composition of faculty and staff[,] and the community and administration attitudes toward the school, must be taken into consideration." (*Keyes, supra,* 413 at p. 196 [37 L.Ed.2d at p. 556].) As the United States Supreme Court explained in *Swann*: "Independent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights ... is shown." (402 U.S. at p. 18 [28 L.Ed.2d at p. 568].)

■ In sum, from a constitutional standpoint, we see nothing inherently invalid in the fact that percentages of various racial or ethnic groups may vary, even significantly, in different schools throughout a school district, or even that a particular minority group may be completely unrepresented in a particular school. On the other hand, if the minority enrollment in a school is so disproportionate as realistically to isolate minority students from other students in the district, a finding of unconstitutional segregation will generally be proper.[16]

We must also point out that in declaring that school districts bear an affirmative obligation to undertake "corrective measures" to attempt to alleviate school segregation with its accompanying specific harm to minority children, our *Jackson* decision was by no means oblivious to the grave practical difficulties that such an effort posed for school boards. Recognizing that "[s]o long as large numbers of Negroes live in segregated areas, school authorities will be confronted with difficult

[16]Although, as we have emphasized, for constitutional purposes a school may be desegregated without being racially balanced, this does not mean that reference should not be made to the racial composition of the district as a whole in determining whether a given school is segregated or not. Thus, for example, in a school district in which "minority" students significantly outnumber "majority" students, a school whose racial composition might in some other district make it a "segregated school" may not warrant that legal characterization. Unquestionably in many situations the determination of whether a given school is "segregated" or not, under the above guidelines, will be a difficult decision, but we believe the variety of factual settings existing throughout our state foreclose a more rigid or concrete definition.

Similar flexibility is evident from a review of the various desegregation plans that have recently been approved by federal courts. (See, e.g., *United States* v. *School District of Omaha, supra,* 521 F.2d 530, 546; *Keyes* v. *School District No. 1, Denver, Colorado* (10th Cir. 1975) 521 F.2d 465, 475-476.)

problems in providing Negro children with the kind of education they are entitled to have" (59 Cal.2d at p. 881), the *Jackson* court articulated the school board's constitutional obligation in terms that take cognizance of these practical problems: "The right to an equal opportunity for education and the harmful consequences of segregation require that school boards *take steps, insofar as reasonably feasible,* to alleviate racial imbalance in schools regardless of its cause." (Italics added.) (*Id.*) The court also observed that "consideration must be given to the various factors in each case, including the practical necessities of governmental operation." (*Id.,* at p. 882.)

In the decade since *Jackson,* extensive litigation and numerous voluntary efforts at desegregation throughout the country have produced virtually scores of administrative techniques for facilitating the desegregation of school systems. Such techniques include, for example, the redrawing of neighborhood attendance zones, the "pairing" or "clustering" of schools, the establishment of "magnet schools," and the implementation of "satellite zoning."[17] Each of the different techniques has had varied success in different circumstances; sociologists are just beginning to explore the complexities which account for the differences in results and to identify the factors which may be utilized to determine which desegregation tool should be used in a given situation. (See generally St. John, School Desegregation: Outcomes for Children (1975).) Under these circumstances, local school boards should clearly have the initial and primary responsibility for choosing between these alternative methods.

■ Moreover, so long as a local school board initiates and implements reasonably feasible steps to alleviate school segregation in its

[17]The "pairing" or "clustering" of schools normally involves the grouping of ethnically diverse "neighborhood" schools into a single unit and rearranging the attendance patterns within such unit to promote desegregation; the rearrangement often is accomplished by designating one school within the unit to handle all students in certain grades (e.g., K-3), while other schools accommodate the students in the unit attending the remaining grades (e.g., 4-6). (See, e.g., *United States* v. *Texas Education Agency, supra,* 467 F.2d 848, 860.) "Magnet schools" are schools which are designated by the district to provide some special classes or programs generally unavailable at some other schools within the district; the technique attempts to restructure the curriculum at certain segregated schools so as to attract the voluntary transfers of students which will promote integration. (See, e.g., *Hart* v. *Community School Bd. of Ed., N. Y. Sch. Dist. #21, supra,* 512 F.2d 37, 42-43, 54-55.) "Satellite zoning" involves the establishment of attendance zones for schools, each of which includes several noncontiguous geographic zones; most commonly, a given region of the "central city" is combined with a geographically distinct region on the periphery of the municipality. (See, e.g., *Swann, supra,* 402 U.S. at p. 9 [28 L.Ed.2d at pp. 562-563].)

district, and so long as such steps produce meaningful progress in the alleviation of such segregation, and its harmful consequences, we do not believe the judiciary should intervene in the desegregation process. Under such circumstances, a court thus should not step in even if it believes that alternative desegregation techniques may produce more rapid desegregation in the school district. In the past, well-intentioned court-ordered desegregation plans which have appeared to promise speedy success have all too often ultimately failed to result in desegregated education. (See, e.g., *Mapp* v. *Bd. of Ed. of City of Chattanooga* (6th Cir. 1975) 525 F.2d 169; cf. *Calhoun* v. *Cook* (N.D.Ga. 1971) 332 F.Supp. 804, 805-806.) In our view, reliance on the judgment of local school boards in choosing between alternative desegregation strategies holds society's best hope for the formulation and implementation of desegregation plans which will actually achieve the ultimate constitutional objective of providing minority students with the equal opportunities potentially available from an integrated education.[18]

The key to judicial deferment to the judgment of a local school board in this area, however, must lie in a school board's demonstration of its commitment to the necessity of immediately instituting reasonable and feasible steps to alleviate school segregation. If such a commitment is translated into an ongoing desegregation program which produces meaningful progress in the elimination of segregated schools, a court has reason to be confident that the constitutional rights of minorities are not being ignored and that a quality desegregated education for all of a district's school children will be provided.

[18] We recognize, of course, that in a number of decisions the United States Supreme Court has explicitly declared that "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*" (*Green* v. *County School Board, supra,* 391 U.S. 430, 439 [20 L.Ed.2d 716, 724]; *Swann, supra,* 402 U.S. at p. 13 [28 L.Ed.2d at p. 565]) and has indicated that this obligation must be complied with "at once." (*Alexander* v. *Board of Education* (1969) 396 U.S. 19, 20 [24 L.Ed.2d 19, 21, 90 S.Ct. 29]; *Carter* v. *West Feliciana School Bd.* (1970) 396 U.S. 290, 291 [24 L.Ed.2d 477, 479, 90 S.Ct. 608].) These pronouncements, however, "were directed toward recalcitrant school boards that had stubbornly set their face against compliance with new constitutional doctrine" (Craven, *The Impact of Social Science Evidence on the Judge: A Personal Comment* (1975) 39 Law & Contemp. Prob. (Pt. I) 150), and we do not believe that such declarations are inconsistent with the position we have set out above. When school boards have adopted and implemented ongoing programs for the alleviation of segregation and the elimination of segregation's harms which have produced meaningful progress and which promise to continue such progress, the absence of complete and immediate desegregation of all of a district's schools does not necessarily demonstrate that the board has failed in its constitutional obligation. (Cf., e.g., *Swann, supra,* 402 U.S. at p. 26 [28 L.Ed.2d at p. 572]; *Hart* v. *Community School Bd. of Ed., N. Y. Sch. Dist. #21, supra,* 512 F.2d 37, 52-53.)

If, however, a court finds that a local school board has not implemented such a course of action, the court is left with no alternative but to intervene to protect the constitutional rights of minority children. Faced with a recalcitrant or intractable school board, a trial court may exercise broad equitable powers in formulating and supervising a plan which the court finds will insure meaningful progress to alleviate the harmful consequences of school segregation in the district. When a local school board defaults in its constitutional task, a court may no longer be justified in relying upon the board to implement programs which hold a reasonable promise for securing the rights of minority children.

4. *Since the trial court found that defendant board had failed to undertake steps to alleviate segregation, it properly ordered the board immediately to prepare and implement a desegregation plan.*

In the instant case, the trial court specifically found that the defendant school board had failed to undertake any steps to alleviate the segregation concededly existing in the district's schools. The record amply supports this conclusion. Although the board now contends that, in light of the large geographic expanse of its school district and the high concentration of minorities in portions of the district widely separated from white students, the complete desegregation of the district's schools would be financially infeasible and educationally counterproductive for all students, this argument does not explain the board's past failure to implement desegregation measures which were unquestionably feasible.

The trial court found, for example, that throughout the many years of this litigation the defendant board continually refused to utilize its authority to draw boundary zones for "neighborhood schools" in such a manner as to alleviate, insofar as possible, segregation in such schools. While such "integrative gerrymandering" may not have produced widespread desegregation throughout the entire district, it would undoubtedly have had some beneficial consequences in the periphery of the central city. Similarly, the trial court found that in locating new schools, closing old ones and in determining the size, grade categories and feeder patterns for such new schools, the school board had failed to reach such decisions with an eye toward promoting desegregation; the board does not explain why such efforts would have been impossible or "counterproductive."

Moreover, defendant school board has failed even to adopt a program which would provide a realistic opportunity for minority children in

segregated schools voluntarily to integrate other schools in the district. As the United States Supreme Court noted in *Swann*: "An optional majority-to-minority transfer provision has long been recognized as a useful part of every desegregation plan. Provision for optional transfer of those in the majority racial group of a particular school to other schools where they will be in the minority is an indispensable remedy for those students willing to transfer to other schools in order to lessen the impact on them . . . of segregation. In order to be effective, such a transfer arrangement must grant the transferring student free transportation and space must be made available in the school to which he desires to move." (402 U.S. at pp. 26-27 [28 L.Ed.2d at p. 572].) Instead of implementing such a program, the board adopted a transfer policy which had the foreseeable consequence of perpetuating and indeed exacerbating the segregation in its district's schools.

In light of defendant's absolute failure to demonstrate that it had undertaken reasonable steps to attempt to alleviate the segregation in its district's schools, the trial court properly ordered the board immediately to prepare and implement a desegregation plan. Although, for the reasons discussed above, that portion of the trial court's order which defined the board's duty in terms of achieving fixed racial percentages in all of its schools was in error, the overall judgment must be sustained.

As already noted, on remand the trial court may exercise broad equitable powers in supervising the preparation and implementation of a reasonably feasible desegregation plan. In exercising such authority, the court must be careful to keep in mind the ultimate constitutional objectives at stake. As we have explained, the goal sought to be achieved is not simply the mixing of races to satisfy statistical predilections, but rather the elimination of the varied harms to minority children which have generally flowed from the maintenance of segregated schools. (See generally Hawley & Rist, *On the Future Implementation of School Desegregation: Some Considerations* (1975) 39 Law & Contemp. Prob. 412.) ■ In seeking to accomplish this end, desegregation plans must be tailored to the peculiar circumstances of the school district at hand, and the adequacy of alternative courses of action need not be judged simply by the quantitative "amount" of desegregation which each alternative is expected to achieve.

Moreover, in weighing alternative approaches to the complex desegregation problems of a particular school district, a trial court can and should consider the potential "costs," both in economic and educational

terms, of the various proposals before it. (See generally Fiss, *The Jurisprudence of Busing* (1975) 39 Law & Contemp. Prob. 194.) Given the practical nature of the remedial issue, a trial court should take into account the long-range effects of the adoption of alternative proposals; a court may reject a particular approach if it finds that its implementation is likely to result in a "one race" or "all minority" school district and consequently in less ultimate opportunities for the benefits of a desegregated education.

We do not mean, of course, that the threat of "white flight" may be used as a smokescreen to avoid the constitutional obligations of a school district (cf. *Monroe* v. *Board of Commissioners* (1968) 391 U.S. 450, 459 [20 L.Ed.2d 733, 739, 88 S.Ct. 1700]; *United States* v. *Scotland Neck Bd. of Educ.* (1972) 407 U.S. 484, 491 [33 L.Ed.2d 75, 81, 92 S.Ct. 2214]); instead, we simply recognize that in weighing the potential efficacy of alternative programs, a realistic evaluation of the ultimate consequences of a particular course of action cannot be ignored. (Cf. *Milliken* v. *Bradley, supra,* 418 U.S. 717, 801-802 [41 L.Ed.2d 1069, 1123-1124] (Marshall, J., dissenting); *United States* v. *School District of Omaha, supra,* 521 F.2d 530, 547; *United States* v. *Board of Sch. Com'rs., Indianapolis, Ind., supra,* 332 F.Supp. 655, 677.) In the end, if a court finds that certain alternatives are not realistically available or particular goals reasonably attainable, it may require the board to take greater efforts in some other direction in attempting to alleviate the consequences of school segregation. (Cf. Bell, *Waiting on the Promise of Brown* (1975) 39 Law & Contemp. Prob. 341, 354-355.)

Although we have not specifically addressed the volatile issue of "busing" in our discussion above, we believe that the general principles we have outlined are equally applicable to that matter. While critics have sometimes attempted to obscure the issue, court decisions time and time again have emphasized that "busing" is not a constitutional end in itself but is simply one potential tool which may be utilized to satisfy a school district's constitutional obligation in this field. (See, e.g., *Swann, supra,* 402 U.S. at p. 28 [28 L.Ed.2d at pp. 573-574]; *United States* v. *Texas Education Agency, supra,* 467 F.2d 848, 874.) ▮ As with the numerous desegregation techniques adverted to above, in some circumstances busing will be an appropriate and useful element in a desegregation plan, while in other instances its "costs," both in financial and educational terms, will render its use inadvisable. As the United States Supreme Court observed in *Swann:* "No rigid guidelines as to student

transportation can be given for application to the infinite variety of problems presented in thousands of situations." (402 U.S. at p. 29 [28 L.Ed.2d at p. 574].) Although a court cannot properly issue a "busing" order so long as a school district continues to meet its constitutional obligations, once a school board defaults in its constitutional task, the court, in devising a remedial order, is not precluded from requiring the busing of children as part of a reasonably feasible desegregation plan.

From the above discussion, it is clear that a trial court's task in supervising the preparation and implementation of a school desegregation plan is an exceedingly difficult, sensitive and taxing one, requiring the balancing and reconciliation of many competing values. It is not a task that any court readily seeks, but it is one that courts may not shirk when the appropriate school authorities default in their constitutional obligation to minority children in their school districts.

In the instant case, both the plaintiffs and the trial court proceeded slowly with this litigation, continually looking for signs that the local school board would acknowledge its obligation to come forth with some reasonable plan for attempting to alleviate the harmful consequences of the segregated education in its district. Such movement was not forthcoming, however, for the school board held resolutely to its contention that it had no obligation to take affirmative, corrective action in this field. Under these circumstances, the trial court's order, compelling the defendant board immediately to prepare and implement a reasonably feasible desegregation plan, was completely justified.

Accordingly, except insofar as it defines "desegregated" school in terms of specific percentages, the judgment of the trial court is affirmed and the case is remanded for proceedings consistent with this opinion. Plaintiffs shall recover their costs on appeal.

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.