138 F.3d 1270
 98 Cal. Daily Op. Serv. 1713, 98 Cal. Daily
Op. Serv. 1827
MONTEREY MECHANICAL CO., Plaintiff-Appellant,
v.
Pete WILSON; Gray Davis; Curt Pringle; Delaine Easton;
Barry Munitz; Roland E. Arnall; Marian Bagdasarian;
William D. Campbell; Ronald L. Cedillos; Jim Considine;
Martha C. Fallgatter; Bernard Goldstein, Jr.; James H.
Gray; William Hauck; Joan Otomo-Corgel, Dr.; Ralph R.
Pesqueira; Ali C. Razi; Ted J. Saenger; Michael D.
Stennis; Anthony M. Vitti; Stanley T. Wang; Frank Y.
Wada, Individually and as Trustee of the California State
University; Swinerton and Walberg Co., a California
Corporation, Defendants-Appellees.
 No. 96-16729.
 United States Court of Appeals,
Ninth Circuit.
 March 9, 1998.
 
 Before: O'SCANNLAIN, LEAVY and KLEINFELD, Circuit Judges.
 
 
 1
 ORDER; Concurrence by Judge KLEINFELD; Dissent by Judge REINHARDT; Dissent by Judge HAWKINS.
 
 ORDER
 
 2
 No party to this case has filed a petition for rehearing or suggestion for rehearing en banc.
 
 
 3
 An active judge of this court sua sponte requested a vote on whether to rehear the case en banc. The matter failed to receive a majority of the votes of the active judges in favor of en banc consideration. Fed. R.App. P. 35.
 
 
 4
 The sua sponte request for rehearing en banc is DENIED.
 
 
 5
 KLEINFELD, Circuit Judge, with whom KOZINSKI, O'SCANNLAIN and T.G. NELSON, join, concurring in the order rejecting the suggestion for rehearing en banc:
 
 
 6
 I concur in the order of the full court rejecting the suggestion that we rehear this case en banc. The dissents from denial of rehearing en banc raise new issues not raised by the parties, and therefore not addressed in the opinion, so the new issues are briefly addressed here.
 
 
 7
 A fundamental principle underlies the decision: Americans are entitled to be treated equally by their government, regardless of their race, their skin color, their nationality, their religion, their sex. The seed of this principle was planted in the Declaration of Independence: "We hold these truths to be self-evident, that all men are created equal." The fruit is the Fourteenth Amendment to the Constitution: "[N]or shall any state ... deny to any person within its jurisdiction the equal protection of the laws." The Fourteenth Amendment extends its guarantees to "any person," in the singular, regardless of that person's ethnicity or sex.
 
 
 8
 This is not to say that, in the complexity of our legal evolution, the courts have treated this principle as absolute. Precedent establishes qualifications. But fundamental to the qualifications is the principle that if the government treats individuals differently according to their ethnicity or sex, it has to justify it.
 
 
 9
 The district court ruled that: (1) the statute did not treat contractors differently by race or sex; (2) to the extent that it did, the extra burdens imposed on the disfavored contractors were de minimis; and (3) even if contractors were treated differently by ethnicity and sex, and even if the differences were not de minimis, appellant had no standing to complain of unconstitutional discrimination, because the contractor that won the bid also was not a member of the preferred groups. Because the district court decision would stand if any of these propositions was sustained, appellant challenged all these grounds for the district court decision, and was entitled to a decision on all of them.
 
 
 10
 1. The dissents suggest that the court ought somehow to have avoided deciding the constitutional question. We cannot evade "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." Colorado River Water Cons. Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976) (Brennan, J.). The narrow scope of review in preliminary injunction appeals does not apply when the district court "misapprehends the law with respect to the underlying issues in litigation." Sports Form, Inc. v. United Press International, 686 F.2d 750, 752 (9th Cir.1982).
 
 
 11
 2. Judge Reinhardt states that in his view, the panel that decided this case and another "improperly assumed jurisdiction over those two cases in contravention of our internal court rules." The law is to the contrary. Circuit Rule 3-3(d), governing "Preliminary Injunction Appeals," says that preliminary injunction appeals, such as this one, are referred to the next available motions and screening panel "for disposition." This case was assigned to the panel in the ordinary course as the rule requires, the panel scheduled and heard oral argument, and then issued a disposition in accord with the rule. Our court's 1997 monthly statistical report shows that for the year through November, motions and screening panels were assigned 50 preliminary injunction appeals, including this one, decided 46 of them, and referred 4 to merits panels. The normal thing to do, done in over 90% of these cases including this one, is for motions and screening panels to decide the preliminary injunction appeals assigned to them.
 
 
 12
 3. Judge Reinhardt's dissent suggests that the court somehow misconstrued the statute, and should have construed it differently or obtained by some means "the views of the state courts." None of the parties argued that the statute was ambiguous, could be construed any other way, or that any state court decision had construed it in any other way. The law at all relevant times was that California "has no procedure for federal courts to certify questions of state law to the state's highest court." Kopp v. Fair Political Practices Comm., 11 Cal.4th 607, 47 Cal.Rptr.2d 108, 115, 905 P.2d 1248, 1255-56 (1995); Nunez v. City of San Diego, 114 F.3d 935, 943 (9th Cir.1997). The State of California construed the statute administratively just as the opinion did, in the "Supplementary General Conditions" form governing contractors. There was no reason to doubt that the statute meant what the parties thought it did, and what the official form said it did.
 
 
 13
 4. Judge Reinhardt says he "cannot imagine why a federal court would preclude a state university or any other interested party from offering evidence at trial...." Nobody was precluded. No party asked to put on evidence at trial. Trials and evidentiary hearings resolve issues of fact. Appellees raised no issues of fact. The state university and the successful bidder argued that they did not have to justify the statute. Even when the decision came down, and they knew that their argument that no justification was needed had not prevailed, neither the state university nor the competing contractor petitioned for rehearing to ask for a chance to go to trial on some question of fact. No facts were disputed. With no party asking for an opportunity to prove anything, and no facts at issue, the court could not have evaded its "unflagging obligation" to decide the constitutional questions at issue.
 
 
 14
 5. Judge Reinhardt's dissent calls the statute a "benign governmental outreach program." He uses the words "benign," "fairness," "good faith," "fair opportunity," "innocuous," "outreach," and "fair-minded" to characterize the statute and the motives of those who supported it. I infer from these warm words that Judge Reinhardt favors the statute. Beyond that sentiment, though, I cannot discern the legal argument.
 
 
 15
 The opinion carefully noted that "[w]e are not faced with a non-discriminatory outreach program." Monterey Mechanical Co. v. Wilson, 125 F.3d 702, 711 (9th Cir.1997). The opinion said "[t]here is much appeal to enlarging the participation of minority-owned and women-owned firms by assuring that they as well as others receive full information on opportunities to bid." Id. But "[t]he outreach the statute requires is not from all equally, or to all equally." Id. As for whether ethnic or sex discrimination by goals rather than quotas is subject to City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), precedent establishes that "the relevant question is not whether a statute requires the use of such measures, but whether it authorizes or encourages them." Bras v. California Public Utilities Comm., 59 F.3d 869, 875 (9th Cir.1995). The government can no more say "you have to show us that you tried to steer the business to group X" than "you must succeed at placing the business with group X," unless it can justify a preference for group X.
 
 
 16
 6. Judge Reinhardt's dissent says that the court's reasons for the vote rejecting the suggestion for rehearing en banc "should be evident" and cites a New York Times Magazine article. I read the article, and, knowing who voted which way in this case, and the criteria upon which my colleagues generally vote, I cannot see anything in the article that makes the reasons evident. The article discusses a Fifth Circuit case, pointing out that some prominent educators dislike the result, and explaining the result as "the tragic impact of the Reagan and Bush appointments." Everyone is entitled to an opinion on whether it is "tragic" when a president of a different party has been elected and has appointed judges, but that has no bearing on the correctness of a judicial decision. Judge Reinhardt could not mean to imply that the judges' votes on whether to rehear the case en banc followed party lines of the appointing presidents, because that implication would be false. Nor is the New York Times Magazine a source of law.
 
 
 17
 Nor is it "evident" to me what the New York Times Magazine article has to do with why the decision came down as it did and was not reheard en banc. None of the parties petitioned for rehearing or suggested rehearing en banc. Judge Reinhardt suggests that this was because California state officials "were obviously not enthusiastic" about complying with civil rights laws, and that my suggestion that the law had anything to do with the lack of petitions is "highly misleading." That makes no sense. This was a battle between Swinerton & Walberg and Monterey Mechanical about a contract worth $21 million. Even had the university's lawyers lost their enthusiasm for their case because of Governor Wilson's views, as Judge Reinhardt speculates, the contractor with $21 million at risk would not have been dissuaded from protecting its money by the governor's policy views. Excellent lawyers zealously represented the state university and also the contractor that had won the contract in the appeal, even though the governor took a contrary view. Nor was there anything to stop others, such as advocacy groups for those in the statutory beneficiary classes, from moving for leave to file amicus curiae briefs.
 
 
 18
 The court's decision was compelled by well established precedent. There is no inter- or intra-circuit conflict. No party petitioned for rehearing en banc. Those factors, doubtless related, probably explain the court's decision not to rehear the case en banc.
 
 
 19
 7. Judge Reinhardt's dissent goes on to say that our court is "no longer a truly representative body" because "there is not a single active African American or Latino judge on our court." The implication appears to be that judges of the ethnicities Judge Reinhardt specifies would, because of their ethnicity, necessarily agree with his view of the law. Courts apply law, and do not act as representative bodies. Judges adhering to their oaths vote based on their view of the law, not their view of their ethnic groups' interests. Many of us have ethnic characteristics that make past discrimination against our own groups quite unforgettable, but that cannot be a basis for deciding a case. The Constitution and precedent are the same whatever our ethnicity. Thought comes from the brain, not the blood.
 
 
 20
 8. Judge Reinhardt incorrectly says that "the opinion suggests that African Americans and Latinos are not actually less well off than whites as a group, but are only 'perceived ' to be such." There is no way that the word "perceived" can be read in context to imply the inference Judge Reinhardt draws. The sentence to which Judge Reinhardt objects is this: "The list in the statute before us might be explained by a laudable desire to improve the social position of various groups perceived to be less well off." Monterey Mechanical Co. v. Wilson, 125 F.3d 702, 714 (9th Cir.1997). We had in the preceding paragraph noted that City of Richmond v. J.A. Croson Co., 488 U.S. 469, 505-06, 109 S.Ct. 706, 727-28, 102 L.Ed.2d 854 (1989), says inclusion of Aleuts and Eskimos in a Richmond, Virginia ordinance suggests that the ordinance was not narrowly tailored to remedy past Richmond discrimination. Taking our direction from the Supreme Court, as we must, we therefore said "some of the groups designated [including Aleuts and Eskimos] are, in the context of a California construction industry statute, red flags signalling that the statute is not, as the Equal Protection Clause requires, narrowly tailored." Our "perceived" sentence says that there may have been laudable motives for the preferences, but because the list included so many groups other than the ones of whose history Judge Reinhardt thinks us ignorant, it was "not plausible ... that the list is narrowly tailored to remedy past discrimination." Monterey Mechanical, 125 F.3d at 714. Judge Reinhardt's ad hominem polemic against his colleagues relies on an inference obviously false to anyone who takes the trouble to read our opinion.
 
 
 21
 9. The statutory definition of the minorities to whom business should be steered includes not only Blacks and Mexican-Americans. Among the many groups included are persons "of color" who are of Spanish origin, Portuguese origin, Cuban, Central or South American, Eskimo, Aleut, Native Hawaiian, Samoan, Guamanian, Indian, Pakistani, and Bangladeshi. Cal. Public Contract Code § 10115.1(d).
 
 
 22
 Applying the statutory "minority" and sex classifications, contractors must try to steer business to an immigrant from Pakistan in preference to an immigrant from Afghanistan, because of where he came from, and to a Beverly Hills orthodontist's daughter in preference to a Daly City motel maid's son, because of her sex. Why? For people in some of these groups, California has always been a land of opportunity, to the extent they have been in California at all, not a land of oppression. Why should those people be preferred? Why should people whose groups have been the objects of California discrimination have their preference diluted, even swamped, by those who have suffered no California discrimination? It is striking that black subcontractors were written in for only $19,980 of the successful, complying contractor's $21,698,000 bid, less than 1/10 of 1%.
 
 
 23
 The Constitutional requirement of "narrow tailoring" is an instrument of justice, not a mere technicality. It has been a delicate affair for the courts to reconcile the principle that each individual is entitled to equal protection of the laws, with the principle that persons in groups that have been discriminated against deserve a leg up in order to have equal opportunity. Past discrimination sometime, somewhere, is not enough. Many of us are of peoples who have suffered oppression, some recently, some long ago, some in America, some in foreign lands. There is no principle more essential to our nation than that all of our peoples have become one people, the American people. Therefore, " 'racial classifications are simply too pernicious to permit any but the most exacting connection between justification and classification.' " Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 236, 115 S.Ct. 2097, 2117, 132 L.Ed.2d 158 (1995). In this case, the "exacting connection" was not even suggested. That, along with all the reasons explained in the opinion and this concurrence, well explains why no party petitioned for rehearing en banc and the court did not vote to rehear the case en banc.
 
 
 24
 REINHARDT, Circuit Judge, with whom Judges PREGERSON and TASHIMA join, dissenting from failure to rehear en banc:
 
 
 25
 By striking down a benign governmental outreach program that is intended to ensure a modicum of fairness to minorities and women, this decision goes far beyond any ever issued by a federal appellate court. It represents an unfortunate day in the history of this court, not only because the opinion disregards both the historical facts and the proper legal processes, and so plainly violates the purpose and spirit of the Fourteenth Amendment, but because in declining to take the case en banc, the court as an institution has so grievously failed in its responsibilities. This is a decision that by any criterion warranted en banc rehearing[1] and that under any objective application of the law required reversal. Although I am prohibited from revealing either the vote or the reasons for the court's failure to take even the first of these steps, both should be evident.[2] Surprisingly, this is also a case that does violence to principles of federalism and to the proper allocation of functions within the federal courts.[3] Fortunately, however, as a result of its legal excesses, the opinion is, in the end, of only minimal precedential value.
 
 
 26
 The portion of the state statute at issue here is the requirement that contractors receiving state contracts make good faith efforts to ensure that minorities, women, and disabled veterans have the opportunity to bid on work that is to be subcontracted. California's "good faith" requirement does not compel a general contractor to award any subcontract work to any minority, women, or disabled veteran business, only to contact them so that they will be informed that the work is available, to encourage them to submit bids, and to consider those bids if made along with all others received. The general contractors are then required to document those efforts.[4] The district court considered these "extra steps" so minimal as to be "hardly worth mentioning." I agree.
 
 
 27
 In striking down the statute, this court decided an important constitutional question on the merits, without permitting the district court to develop any facts at a trial or an evidentiary hearing--even though, under the constitutional doctrine the opinion deems applicable, the facts must be explored before the statute's validity can properly be determined. Because the appeal was from the denial of a preliminary injunction, there can be no justification for such a decision. Moreover, this court gives a wholly novel and unwarranted construction to a state statute, although no state court had ever so construed it in the twenty years it has been in effect.
 
 
 28
 The provision invalidated by this court does no more than assure minimal fairness in the bidding process to minorities and women, groups that have had enormous difficulty in the past obtaining their fair share of government contracts.[5] The opinion does so in reliance not on any "outreach" case, but entirely on cases that invalidate quotas or numerically fixed set-asides--cases I believe to be wholly inapplicable. I am aware of no other decision that has struck down a provision as innocuous as the one before us, no other decision that has invalidated a provision that requires only the dissemination of information--and I am aware of no other court that has ever struck down any type of affirmative action statute on equal protection grounds without permitting a factual inquiry into the basis for its enactment.
 
 
 29
 * I cannot accept the opinion's basic premise that "outreach" programs designed to provide a fair opportunity to bid on an equal basis to those who have been historically disadvantaged constitute unlawful discrimination and thus a violation of the Constitution. Outreach programs serve to ensure equal opportunity by transmitting the information that work is available to persons who have traditionally been shut out, and who historically have failed to receive the data necessary to enable them to participate in the economic arena on an equal footing, or on any footing at all. Word of mouth has been the traditional method of filling jobs and providing business opportunities in our society. That method of disseminating information resulted in the limiting of economic opportunities to those who had connections, direct or indirect, with the contractors or employers involved. Ordinarily this meant that the opportunities were enjoyed primarily, if not exclusively, by members of the white majority, specifically by white males. The outsiders, the members of minority groups, rarely, if ever, had the contacts necessary to inform them of the existence of job openings or of the availability of business, and women simply were not a factor--certainly not in the contracting area. It was to counter this historic inequity that outreach programs were developed.
 
 
 30
 Given this history, fair-minded people in California--and fair-minded legislators--agreed that steps must be taken to ensure adequate notice to minority and women contractors as well as adequate consideration of their bids. It goes without saying that the statute in no way limits the giving of notice to others. The provision in question is designed to assure only that, when notices are given, minorities and women will not be excluded. All this is, of course, wholly apart from the question of quotas or set-asides, which raise separate and different issues that are not before us today.
 
 
 31
 The opinion turns California's benign outreach program into invidious discrimination by conjuring up, without any factual basis or any factual record, imagined forms of discrimination against white male contractors--discrimination that the statute does not contemplate, but that the opinion incorrectly concludes it mandates. It is not necessary to repeat the series of supposed but illusory injuries that the opinion posits, such as the "injury" that results from "requiring" white contractors to subcontract work they prefer to perform themselves. See Monterey Mechanical Co. v. Wilson, 125 F.3d 702, 708 (9th Cir.1997). There is no such requirement in the statute, and there is nothing in its text or in the district court record that remotely suggests the possibility that any such "injury" would occur. Indeed, the various injuries alluded to in the opinion simply do not exist.
 
 
 32
 It is significant that the opinion does not cite a single California case that supports its construction of the statute; in fact, it does not cite a single California case for any purpose. I would think that before giving as "creative" a construction as the opinion does to a state statute--a construction that provides the basis for the holding that the statute is unconstitutional--a court concerned with the interests of federalism would have wanted to determine how the state itself construes, or would construe, the provision.[6] The opinion, however, reveals no interest in doing so. Without mentioning state law, it simply interprets the statute in a novel way that renders it, in the court's view, unconstitutional. The opinion makes no attempt to determine the views of the state courts, to permit the development of a factual record or to interpret the measure in a manner that might preserve its constitutionality.[7]
 
 
 33
 Although California has enjoyed almost 20 years of experience under the outreach provision, there is not a single suggestion in the record that any white male has ever been the victim of any discrimination of any kind. Nor does the opinion purport to identify any such occurrence. Instead it simply concludes that affording fair opportunities to minorities and women necessarily violates the rights of the white majority, and thus offends the Constitution. In fact, the plaintiff here, the contractor who was not awarded the bid, complied with the "outreach" provisions in all essential aspects, and cannot legitimately complain that it was injured thereby. The only reason it did not receive the contract is that it did not file the necessary reports with the state.[8] In any event, because all contractors must file forms, it is beyond question that the contractor, whether or not it should have received the award, was not the victim of invidious discrimination.[9] To the contrary, it is California's effort to be fair to minorities and women that is the victim in this case.
 
 II
 
 34
 Even were we to assume that a benign outreach program implicates serious 14th Amendment concerns--and I had thought that the 14th Amendment was designed to assure that minorities would be treated fairly--there would still be no basis in law for this court's striking down the statute prior to a factual hearing or a trial on the merits. The question in "set aside" cases--and we can view this outreach provision as if it were a set-aside requirement for purposes of the remaining portion of this analysis--is whether at the time the statute was passed the state action was justified by historical discrimination. In set-aside cases, courts must carefully examine the state of affairs that brought about the enactment of the provision in question.[10] Were the practices at the time so discriminatory that the legislative action was warranted? Is the remedy narrowly tailored? In other words, a court would be required in a case such as this to determine the state of affairs with respect to discrimination in the award of contracts and subcontracts a generation ago, and whether those facts justify the statutory remedy. Given the history of discrimination against minorities in California, there is certainly reason to believe that at a trial on the merits, it would have been possible to establish facts sufficient to justify not only a benign "outreach" program but a statute that did far more. In fact, a "searching inquiry," Croson, 488 U.S. at 493, 109 S.Ct. at 721-22, would in all likelihood have uncovered facts sufficient to justify a Croson-type statute, with numerically fixed set-asides.[11]
 
 
 35
 The history of de jure and de facto discrimination against minorities in California antedates Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)--the case involving discrimination against Chinese-owned laundries that serves as the grandfather of modern equal protection law--and the alien land laws that were in force in California for so long a time, see Fujii v. State, 38 Cal.2d 718, 242 P.2d 617 (1952). The latter statutes prevented members of certain racial groups from acquiring any interest in California real property and were, in the California Supreme Court's words, "obviously designed and administered as an instrument for effectuating racial discrimination." Id. 242 P.2d at 630. A thorough description of the history of such discrimination in public education in California may be found in Crawford v. Board of Educ., 17 Cal.3d 280, 130 Cal.Rptr. 724, 551 P.2d 28 (1976). In that case, the California Supreme Court adopted a lower court's extensive findings, concluding that the Los Angeles school board for many years "knowingly, affirmatively, and in bad faith ... by affirmative policies ... and practices ... segregated de jure its students." Id. at 728, 551 P.2d at 32 (quotation marks omitted). The state's flagrant official bias with respect to housing was the subject of Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), in which the United States Supreme Court invalidated a state initiative measure (Proposition 14) repealing California's fair housing laws. As Justice White, writing for the majority, stated with respect to the state constitutional amendment passed by the voters of California in 1964: "Section 26 was intended to authorize, and does authorize, racial discrimination in the housing market. The right to discriminate is now one of the basic policies of the State." Id. at 380, 87 S.Ct. at 1634 (emphasis added).
 
 
 36
 Yick Wo, Fujii, Crawford, and Reitman are simply illustrative of the extent to which racial discrimination permeated California society as of the period in which the outreach provision in question was first enacted. There is, sadly, a rich history of discrimination in the Golden State, sometimes in the form of initiative measures enacted by the voters. The specific examples detailed above do not, of course, prove that there was a similar pattern of discrimination with respect to the award of state contracts and subcontracts, but they certainly illustrate why a factual inquiry not only was required by law but would in all likelihood have been highly productive.
 
 
 37
 To borrow Justice Stevens' comment from another discrimination case, "this is a case in which a few pages of history are far more illuminating than volumes of logic and hours of speculation...." Presley v. Etowah County Comm'n, 502 U.S. 491, 511, 112 S.Ct. 820, 832-33, 117 L.Ed.2d 51 (1992) (Stevens, J., dissenting). Here a paragraph or two should have been enough. The opinion states that in California "the political power of one [ethnic group or gender] or another waxes or wanes" periodically in the course of events. Monterey Mechanical Co., 125 F.3d at 715. That is simply not what has transpired either in this country as a whole, or in any of the states of the Union. Both nationally and in California, economic and political power has not fluctuated among groups. Rather, it has, at all times, remained firmly and fully in the hands of the white majority.
 
 III
 
 38
 The manner in which the opinion resolves the factual question regarding past discrimination, and concludes that no hearing is necessary to determine whether a factual basis existed for the passage of the statute, is not only contrary to Supreme Court precedent[12] but to the proper allocation of jurisdiction between trial and appellate courts. The court simply disregards orderly legal processes and decides on the merits a constitutional question that should not have been decided in this appeal. It is important to understand the posture of the proceedings before this court. The case was at its very inception. The issue presented on appeal was extremely limited: did the district court err in refusing to issue a preliminary injunction? The district court had decided the question on a skeletal record; the state university that awarded the contract had offered no evidence on the question of past discrimination, in the belief that such evidence was not necessary to defeat the contractor's motion. The state university thought, as did the district judge, that the benign outreach requirement did not in any way adversely affect the interests of white contractors and that, accordingly, no proof of the historic facts regarding past discrimination was necessary, at least at the preliminary injunction stage. The opinion concludes otherwise. However, rather than simply reversing the denial of the preliminary injunction, and allowing the parties to adduce the requisite evidence the court assumed that no past discrimination occurred and held that the statute was unconstitutional as a matter of law.
 
 
 39
 Resolving the constitutional question on the merits notwithstanding the highly limited nature of the issue before it was clearly improper. The correct inquiry was whether the district court abused its discretion in assessing the likelihood that the defendants would prevail on the merits after trial. See, e.g., American Passage Media Corp. v. Cass Communications, Inc., 750 F.2d 1470, 1472 (9th Cir.1985). Going well beyond that question, the court peremptorily held the statute unconstitutional on the ground that the state university had not shown that discrimination in state contracting existed at the time the statute was adopted. The ruling was not only clearly erroneous on the merits but was based on a clear misapprehension of the nature and function of a preliminary injunction proceeding.
 
 
 40
 In holding that the statute was unconstitutional, the court relied heavily on the fact that a university contracting officer stated in a letter responding to an inquiry by the unsuccessful contractor that he was unaware of any "disparity study." There was, of course, no reason that he should have been. The historical record regarding discrimination in the award of state contracts and subcontracts was a matter not within the ken of the local contracting official. The opinion nevertheless seized upon his letter, which is reprinted below,[13] and treated it as if it were the only evidence that would ever be available to the state.
 
 
 41
 The court did not explain how it could justify depriving the state of the opportunity to establish the historical facts at an evidentiary hearing or a trial. Instead, it simply pointed to the fact that a university contracting officer did not know whether there was a "disparity study," and then added the following peculiar statement: "In the case before us, the University offered no evidence whatsoever to justify the race and sex discrimination." 125 F.3d at 713. The statement gives the impression that the court either forgot that no trial or evidentiary proceeding had yet been conducted or that it simply misunderstood the purpose and nature of a preliminary injunction.
 
 
 42
 A motion for a preliminary injunction, unlike a motion for summary judgment, pertains only to the status of the case pending trial on the merits. There is no requirement that either side offer any evidence to support that motion, let alone offer any evidence with respect to the issues ultimately to be litigated. It is elementary that the university's failure to offer evidence of past discrimination when opposing the motion for a preliminary injunction in no way warrants the conclusion that no evidence of discrimination exists. The tactical decision to defend against a preliminary injunction on a legal theory that does not depend on factual evidence has no consequence beyond its immediate effect on the moving party's right to obtain a preliminary injunction. There is no preclusive effect to determinations made for purposes of relief pendente lite.
 
 
 43
 The university's decision not to rely on factual evidence of past discriminatory conduct at a preliminary injunction hearing in no way affected its right to introduce whatever evidence it might desire at the subsequent trial. Parties are entitled to reserve for trial (or for a possible summary judgment motion) any and all evidence in their possession. As far as can be told from the record, the university had neither the desire nor the capacity to put on an extensive case regarding the history of discriminatory contracting in California at the time the expedited preliminary injunction proceeding was held. However, the opinion draws the inference from the university's tactical decision that the state not only had no evidence on the subject, but that it would be unable to obtain any evidence by the time of trial. Only this misguided notion permits the holding that strikes down, prior to trial or summary judgment, a benign and unexceptional state statute.
 
 
 44
 I am aware of no other case in which a court has treated a state statute in so cavalier a manner or has so blatantly disregarded the rights of the citizens of a state. I cannot imagine why a federal court would preclude a state university or any other interested party from offering evidence at trial as to what the circumstances were at the time a statute was enacted. Ordinarily, federal courts, indeed any courts, are interested in hearing the facts before they rule. Here, the opinion pretermitted any factual showing. Thereupon, the court undertook on its own to decide an issue that properly belongs in the district court and, equally surprising, in doing so wholly failed to consider the role state courts should play in the interpretive process.
 
 
 45
 Because the decision in this case is based on the fact that no evidence of past discrimination was introduced, it will undoubtedly prove to be of little, if any, precedential value, and will not affect the outcome of subsequent cases. In any future case, I assume the parties will be afforded the usual opportunity to adduce the facts, and they will then introduce evidence of past discrimination. The next panel will thus have to consider any similar question in light of the facts and the law, not, as here, in light of its own predilections.[14]
 
 IV
 
 46
 I cannot conclude without noting that the opinion suggests that African Americans and Latinos are not actually less well off than whites as a group, but are only "perceived " to be such. 125 F.3d at 714 (emphasis added). Perhaps this court really thinks that equality has been obtained and that no more need be done with respect to the problem of racial discrimination. Perhaps we are truly convinced that we no longer face serious issues of racism in this nation, that we are today a colorblind society, and that any further action to help bring about equality is both unnecessary and unconstitutional. Or perhaps there is some other explanation that simply escapes me for allowing an opinion that is wholly without legal merit to become the law of the circuit.[15]
 
 
 47
 Dissenting in Croson, Justice Blackmun stated: "So the Court today regresses. I am confident, however, that, given time, it one day again will do its best to fulfill the great promises of the Constitution's Preamble and the guarantees embodied in the Bill of Rights--a fulfillment that would make this Nation very special." 488 U.S. at 562, 109 S.Ct. at 757 (Blackmun, J., dissenting).
 
 
 48
 Today, in refusing to go en banc, our court regresses even further--further than any other federal appellate court. Today, we also erect new barriers to the achievement of full minority rights. Nevertheless, like Justice Blackmun, I remain confident that, given time, we will once again, someday, have a federal judiciary that will afford full meaning to the guarantees embodied in our Constitution and will fulfill the promises that would make this a truly great Nation. I remain confident especially that this court will one day return to its task of ensuring fairness to all. Before that day can arrive, however, our Nation's federal jurists will have to develop a far better understanding than we apparently now possess of the terrible and painful consequences of our history of racism in our country, and the compelling reasons why we must act forcefully and affirmatively to bring about true equality.
 
 
 49
 I dissent from the court's refusal to rehear this case en banc.[16]
 
 
 50
 HAWKINS, Circuit Judge, dissenting from the failure to grant en banc review.
 
 
 51
 The panel in this case engaged in a logic that defies first principles of judicial restraint as I understand them. The case as presented had nothing to do with set asides or quotas, but rather enforcement of a statutory requirement that contractors on California public works projects demonstrate "good faith" in providing notice of an opportunity to bid to minority and women-owned businesses. The successful bidder complied with this requirement, Monterey Mechanical did not. Monterey Mechanical was not denied work on this public project because it failed to set aside certain percentages of subcontract work to minority-owned businesses. To the extent the district court decided the case on any other basis, it should have been told to restrict itself to the issues actually before it.
 
 
 52
 The specific principle of judicial restraint to which I refer is embodied in my father's advice given to me in my youth: "Never cross the street to pick a fight." The provision of the statute actually at issue had nothing to do with quotas or set asides, but the giving of notice. Rather than simply decide that issue, the panel "crossed the street" to an issue they did not need to decide and "picked a fight" with it. This was no reluctant assumption of a duty that could not be shirked, but a willing assumption of a burden that did not exist.
 
 
 
 [1]
 See Fed. R.App. P. 35(a); Ninth Cir. R. 35(a)
 
 
 [2]
 See A. Leon Higginbotham, Jr., Breaking Thurgood Marshall's Promise, N.Y. Times Magazine, Jan. 18, 1998, at 28
 
 
 [3]
 I also believe that the motions panel that decided this case and the companion case involving the constitutionality of California's Proposition 209, Coalition for Economic Equity v. Wilson, 122 F.3d 692 (9th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997), improperly assumed jurisdiction over those two cases in contravention of our internal court rules. I have been persuaded, however, not to discuss that matter in this opinion, but rather to do so within the confines of the court. I omit the discussion reluctantly because I believe it is both relevant and material to the issues I examine in this dissent
 
 
 [4]
 Compliance with this good faith provision is sufficient. There is no need, under the statute, to meet any goals. It is the "good faith" provision that plaintiff failed to meet and that the district court believed supported the denial of the preliminary injunction. See Cal. Pub. Cont.Code § 10115
 
 
 [5]
 I will not discuss the effects of the decision on disabled veterans because the court purports not to invalidate the statute to the extent that it applies to them. Monterey Mechanical Co. v. Wilson, 125 F.3d 702, 706 n. 5 (9th Cir.1997). It is not clear, however that the disabled veterans provision can lawfully be severed from the remainder of the statute. See Calfarm Ins. Co. v. Deukmejian, 48 Cal.3d 805, 258 Cal.Rptr. 161, 771 P.2d 1247 (1989)
 
 
 [6]
 In a case argued the very same day as this one, the court proclaimed:
 As a general rule, federal courts "ought not to consider the constitutionality of a state statute in the absence of a controlling interpretation of its meaning and effect by the state courts." [Arizonans for Official English v. Arizona, 520 U.S. 43, ----, 117 S.Ct. 1055, 1072, 137 L.Ed.2d 170 (1997) ] (quoting Poe v. Ullman, 367 U.S. 497, 526, 81 S.Ct. 1752, 1767-68, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting)).... "Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel State Act not yet reviewed by the State's highest court." Id. at ----, 117 S.Ct. at 1074.
 Coalition for Economic Equity v. Wilson, 122 F.3d 692, 699-700 (9th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997).
 
 
 [7]
 The Court in Adarand Consts., Inc. v. Pena, 515 U.S. 200, 237-39, 115 S.Ct. 2097, 2118, 132 L.Ed.2d 158 (1995), even when presented with federal regulations, remanded the case to allow the district court to interpret the law in the first instance
 
 
 [8]
 Whether or not that failure should have been a ground of disqualification is another matter, one that we need not consider here
 
 
 [9]
 Nor, as explained earlier, was the contractor required to discriminate against anyone else. It was free to give notice to as many white subcontractors as it wished
 
 
 [10]
 See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Both Adarand and Croson require, and in fact rest explicitly on the very presumption, that courts engage in a detailed factual inquiry to determine the nature and extent of past discrimination. See Croson, 488 U.S. at 493, 109 S.Ct. at 721 (plurality opinion) ("Absent searching judicial inquiry into the justification of such race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics."); see also Adarand, 515 U.S. at 225-27, 237-39, 115 S.Ct. at 2112, 2118 (requiring fact-specific inquiry into past discrimination and remanding case for such an inquiry without reaching the question of the constitutionality of the statute). As the Court explained in Croson:
 Nothing ... precludes a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction. If the city of Richmond had evidence before it that non-minority contractors were systematically excluding minority businesses from subcontracting opportunities it could take action to end the discriminatory exclusion.
 ....
 Proper findings in this regard are necessary to define both the scope of the injury and the extent of the remedy necessary to cure its effects.
 Croson, 488 U.S. at 509-10, 109 S.Ct. at 730 (plurality opinion).
 
 
 [11]
 I will not address the opinion's final point regarding which minority groups might have been the victims of discrimination in contracting, because that is obviously a factual issue to be determined at trial
 
 
 [12]
 See, inter alia, supra note 10 (discussing the type of searching inquiry required under Croson and Adarand )
 
 
 [13]
 Haaziq Muhammad, the contracting officer for California Polytech, replied to a letter sent by the contractor a week earlier:
 In your letter of June 19, 1996, you request that we provide you a "disparity study". We are aware of no public record by that name or description. Thus, we cannot provide it to you.
 That is the entirety of the body of the letter that the opinion finds so significant.
 
 
 [14]
 The court does not base its decision on California's Proposition 209, which was heard the same day and was decided prior to the issuance of the opinion here. See Coalition for Economic Equity, supra at note 6. I would comment only that, consistent with what I have said earlier, I do not believe that Proposition 209's ban on "preferences" is applicable to "outreach" programs, and thus the provision of that measure would not apply to such requirements
 
 
 [15]
 Maybe the explanation lies partly in the fact that we now have only 18 active judges when we should have 28. Or perhaps our failure to go en banc stems partly from the fact that we are no longer a truly representative body. Although we serve one of the largest minority populations in the nation, there is not a single active African American or Latino judge on our court. Had these circumstances been different, it is possible that we would not have had so unfortunate and erroneous a result in this case
 
 
 [16]
 That Judge Kleinfeld has chosen the unusual course of filing a separate defense of the opinion he authored should tell us more than enough about the inadequacy of that opinion. I do not believe that it would be appropriate to respond to his defense, except to point out the highly misleading nature of his argument regarding the failure of the parties to seek an en banc rehearing. The intended beneficiaries of the statute invalidated by the panel are women and members of minority groups. Those beneficiaries were not parties to or represented in the litigation. California's current state officials--who were parties--were obviously not enthusiastic about being compelled to comply with the state's civil rights laws, and indeed disapproved of them. In fact, the Governor, who was the lead defendant, hired the Pacific Legal Foundation, a private institution, to represent him in order to challenge, rather than defend, the civil rights statute at issue. Is it any wonder no petition for rehearing or suggestion for rehearing en banc was filed?