[No. G028752. Fourth Dist., Div. Three. May 31, 2002.]

DONALD BRUCE CRAWFORD, Plaintiff and Appellant, v. HUNTINGTON BEACH UNION HIGH SCHOOL DISTRICT et al., Defendants and Respondents.

## COUNSEL

Pacific Legal Foundation, Sharon L. Browne and Stephen R. McCutcheon, Jr., for Plaintiff and Appellant.

Rutan & Tucker, David C. Larsen and Terence J. Gallagher for Defendant and Respondent Huntington Beach Union High School District.

Linda A. Catatic, Marsha A. Bedwell and Joanne Lowe for Defendant and Respondent California Department of Education.

Munger, Tolles & Olson, Vilma S. Martinez, Allison B. Stein and Henry H. Gonzalez for The Educational Legal Alliance of the California School Boards Association as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**SILLS, P. J.**—Donald Bruce Crawford sued the Huntington Beach Union High School District and the California Department of Education (collectively the District unless the context indicates otherwise), contending the racial and ethnic balancing component of the District's open-transfer policy violates Proposition 209 (Cal. Const., art. I, § 31). He appeals the judgment entered after the trial court denied his motion for summary judgment and granted the District's. We agree with his contention on appeal—that the policy violates Proposition 209. Accordingly, we reverse the judgment.

I

### *The Transfer Policy*

The District has an open transfer policy for all its high schools. The open-transfer policy has a "racial and ethnic balance" component as required by section 35160.5 of the state Education Code. This statute dictates that "school districts shall retain the authority to maintain appropriate racial and ethnic balances among their respective schools at the school districts' discretion or as specified in applicable court-ordered or voluntary desegregation plans."[1]

There are six high schools in the District, but the only high school affected by the one-for-one same race exchange policy, that is, has been declared "ethnically isolated," is Westminster High School. The District has employed a private firm, Davis Demographics, to do demographic studies for it. This private firm uses, in the language of the firm's owner, Gregory Davis,

---

[1] Education Code section 35160.5 provides in pertinent part: "[T]he governing board of each school district shall, as a condition for the receipt of school apportionments from the state school fund, adopt rules and regulations establishing a policy of open enrollment within the district for residents of the district. . . . [¶] (2) The policy shall include all of the following elements: [¶] (A) It shall provide that the parents or guardian of each schoolage child who is a resident in the district may select the schools the child shall attend, irrespective of the particular locations of his or her residence within the district, except that school districts shall retain the authority to maintain appropriate racial and ethnic balances among their respective schools at the school districts' discretion or as specified in applicable court-ordered or voluntary desegregation plans."

in a declaration in the record, "District data from student records of names, addresses, schools of attendance, and ethnicity," which has been "stored in a computer program which can be utilized to generate statistical information based on race relative to each high school and its established geographic attendance area."

The actual tables supplied by Davis Demographics for Westminster High School put every student into one of the following categories: (1) "American Indian or Alaska Native"; (2) the Asian sub-categories of (a) "Japanese," (b) "Korean," (c) "Chinese," (d) "Vietnamese," (e) "Laotian" and (f) "Other Asian"; (3) "Hawaiian/Pacific Islander"; (4) "Filipino"; (5) "Mexican American Chicano Span. Surn." ; (6) "Black Negroid Afro-American"; and (7) "Total White Students."[2]

To prevent an "inappropriate" racial and ethnic balance, the District restricts transfers to and from Westminster High School. If you are White and you live inside the high school's attendance area, you cannot transfer out unless another White student·is willing to transfer in and take your place. If you are non-White and you live outside the high school's attendance area, you cannot transfer in unless another non-White student is willing to transfer out and you take that student's place.

Demographic studies calculated that, for the 1999-2000 academic year, the school's makeup was roughly four-tenths Vietnamese (41.1 percent, total Asian is 45.2 percent), three-tenths "Mexican American Chicano Spanish Surname" (30.5 percent), and one-sixth "White" (15.9 percent).

Crawford, a taxpayer in the District, brought this action in September 1999 to challenge the constitutionality of the one-for-one same race exchange policy under Proposition 209. Crawford and the District both brought motions for summary judgment. The District's motion largely relied on several pre-Proposition 209 cases decided under the *state* equal protection clause.

In mid-December 2000, the trial court granted the District's motion and denied Crawford's. In a brief minute order, it ruled that the District's transfer policy was not prohibited under Proposition 209 and "promotes a non-segregated public education." The formal order granting the District's motion stated that the court had considered the Supreme Court's recent opinion in *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th

---

[2] The "total Whites" category includes students who are classified as "Egyptian/Iranian/Lebanese."

537 [101 Cal.Rptr.2d 653, 12 P.3d 1068] (*Hi-Voltage*) and that the case "had no application" to the "pending dispute."

## II

## *California Law*

■ Crawford contends the trial court erred in granting the District's summary judgment motion. He contends the racial balancing component of the District's open enrollment program violates Proposition 209. We agree.

The voters adopted Proposition 209 in the November 1996 General Election. The initiative measure added section 31 to article I of the California Constitution, which states in relevant part: "(a) The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."

In *Hi-Voltage, supra,* 24 Cal.4th 537, the California Supreme Court applied a common and plain meaning approach to the words "discriminate against, or grant preferential treatment to" as used in Proposition 209. As of this writing, the only other published decision to substantively consider a challenge to a government program under Proposition 209 is *Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16 [112 Cal.Rptr.2d 5] (*Connerly*). *Connerly* involved challenges to several state government affirmative action programs, all of which were held to contravene Proposition 209.

In *Hi-Voltage,* all seven members of our state's high court held that San Jose's contractor outreach program on behalf of "women and minority business enterprises" was unconstitutional under article I, section 31 of the state Constitution. (*Hi-Voltage, supra,* 24 Cal.4th at p. 562 ["we remain persuaded the City's Program violates section 31"]; *id.* at p. 572 (conc. opn. of Mosk, J.) ["despite the legitimacy and even necessity of its end, the means that the city's program employs offend section 31"]; *id.* at p. 575 (conc. opn. of Kennard, J.) [applying "common meaning of 'preferential,' I agree . . . that the challenged program of the City of San Jose grants preferential treatment on the basis of race and sex in the operation of public contracting"]; *id.* at p. 596 (conc. & dis. opn. of George, C. J.) ["we must conclude that an outreach program directed to an audience on the basis of its members' race or gender constitutes a program that grants preferential treatment for purposes of article I, section 31"].)

The program considered by the high court in *Hi-Voltage* gave prospective bidders on city contracts a choice. They could, *but were not required,* to use

a certain percentage of subcontractors who were women or members of ethnic minorities. Alternatively, they merely had to document their efforts to reach out to "women and minority business enterprises" to give them the opportunity to obtain a subcontract on the program. That meant simply giving notice to at least four businesses owned by women or members of a minority ethnic group. The teeth in the second choice was that if a prospective bidder rejected a low bid from a subcontractor owned by a woman or a member of a minority ethnic group, he had to give written reasons for the rejection. (*Hi-Voltage, supra,* 24 Cal.4th at p. 542.) The program had been prompted by a study that had shown "a historical pattern of discrimination by prime contractors against minority-owned and women-owned subcontractors . . . with regard to public contracts awarded by the city." (*Id.* at p. 588 (conc. & dis. opn. of George, C. J.).)

In *Hi-Voltage,* the city argued that its outreach program did not involve any "overt discrimination." (*Hi-Voltage, supra,* 24 Cal.4th at p. 560, fn. 13.) The procedures were merely a device to "screen" for discrimination. (*Id.* at p. 544.) The city claimed that, operationally, the program merely expanded the pool of candidates to obtain subcontract jobs, but did "not afford preferential treatment on the basis of race or gender in the actual selection process itself." (See *id.* at p. 593 (conc. & dis. opn. of George, C. J.).)

Even so, the court determined that the program contravened Proposition 209. The key constitutional language of the provision is in the words "discriminate against or grant preferential treatment to." The court looked to the ordinary plain meaning of the key words. "Discriminate" means "distinctions in treatment." A "preference" means the " 'giving of priority or advantage to one person . . . over others.' " (*Hi-Voltage, supra,* 24 Cal.4th at pp. 559-560; see also *id.* at p. 575 (conc. opn. of Kennard, J.).)

Using the plain ordinary meaning of the words "discriminate" and "preference," it was clear that, while the city's outreach program might not have involved, as the city claimed, any "overt" discrimination, it was still discriminatory and preferential. The program required prospective bidders to give " 'personal attention' " to potential subcontractors owned by women and members of minority ethnic groups that was not required to be given to other businesses. (*Hi-Voltage, supra,* 24 Cal.4th at p. 544; see also *id.* at p. 590 (conc. & dis. opn. of George, C. J.) [agreeing that documentation component granted preferential treatment within the meaning of Prop. 209].) Requiring prospective bidders to give "special assistance and information" based on race or sex was enough to contravene Proposition 209. (*Hi-Voltage,* at p. 544.)

Moreover, as the Chief Justice pointed out, the program was also discriminatory in the *incentives* that it created. A prime contractor was given a "strong incentive" to grant preferential treatment to at least some prospective subcontractors owned by women or members of minority ethnic groups because it would allow the prime contractor to avoid the burdensome documentation requirements and to look good for future contracts. (See *Hi-Voltage, supra*, 24 Cal.4th at p. 592 (conc. & dis. opn. of George, C. J.).)

While the court made it clear that preferential treatment based on race or gender was impermissible in light of Proposition 209, it acknowledged its holding was "necessarily limited to the form at issue here, which requires contractors to notify, solicit, and negotiate with [minority or female owned] subcontractors as well as justify rejection of their bids." (*Hi-Voltage, supra*, 24 Cal.4th at p. 565.) The court expressed "no opinion regarding the permissible parameters" of outreach efforts that would not offend Proposition 209. (*Hi-Voltage*, at p. 565.)

In *Connerly, supra*, 92 Cal.App.4th 16 the appellate court reviewed five state government affirmative action programs. The court concluded Proposition 209 prevented the state from awarding public contracts, civil service positions, and employment promotions to "favored groups" on the basis of race or gender. (*Connerly, supra*, 92 Cal.App.4th at pp. 47-63.) Although the court severed and upheld certain elements of the challenged programs, most notably data collection and reporting requirements, it reiterated the core idea that "racial classification is presumptively invalid, and the burden is on the government to demonstrate extraordinary justification. [Citations.]" (*Id.* at p. 36.)

The first of the programs under review in *Connerly* was a subcontracting program under the auspices of the state lottery requiring bidders for business with the state lottery commission to include specific plans "to utilize subcontracts with socially and economically disadvantaged small business concerns." Race, ethnic and gender classifications were incorporated into the meaning of the phrase, "socially and economically disadvantaged." (See *Connerly, supra*, 92 Cal.App.4th at pp. 47-48.) In theory White males could be included as persons who were "socially and economically disadvantaged" as well, but there were "no definitional criteria, no application procedures, and no procedures for review." (*Id.* at p. 48.)

The court held the program unconstitutional, because of the operational *presumption* of disadvantage. "Even if such procedures [allowing White males to apply] were included in statute, the fact that some individuals must

*prove* disadvantage while others are *conclusively presumed* to be disadvantaged based solely on race, ethnicity, and gender, established impermissible race, ethnicity, and gender classifications." (*Connerly, supra,* 92 Cal.App.4th at p. 48, italics added.)

The next program reviewed by the *Connerly* court involved state contracts for professional bond services (essentially the folks who help the state sell its bonds to investors). The program operated much the same way as San Jose's government contract program did. If there was a bond service available without competitive bidding, the respective government department was required, at a minimum, to give notice to all women and minority enterprises who had listed their names with the awarding department. In short, they got "special notice of the sale." (See *Connerly, supra,* 92 Cal.App.4th at p. 51.) And because they got *special* notice, the *Connerly* court held that the program contravened Proposition 209 because it involved the "selective dissemination of information" (*Connerly,* at p. 51.)

The third program held unconstitutional in *Connerly* involved the state civil service generally. A general statute made each governmental agency " 'responsible for establishing an effective affirmative action program.' " (*Connerly, supra,* 92 Cal.App.4th at p. 53.) Each agency was supposed to establish "goals and timetables to overcome identified underutilization of minorities and women.' " (*Id.* at p. 55.)

The court held that the duty imposed on "every managerial employee, from first line supervisors on up, to attempt to achieve the agency or departmental goals" of eliminating the "underutilization" was both violative of both Proposition 209 *and* equal protection. (*Connerly, supra,* 92 Cal.App.4th at p. 55.) It differed from a quota or set-aside "only in degree." (*Ibid.*) It was still a "line drawn on the basis of race and gender." (*Ibid.*)

Next, *Connerly* considered an affirmative action program for the state community college system. Each community college district was required to have a plan which ensured "that district personnel participate in, and are committed to, the affirmative action employment program." (*Connerly, supra,* 92 Cal.App.4th at p. 58, citing Ed. Code § 87102, subd. (a).) The plan included "hiring goals and timetables for its implementation" with the "goal" that by the year 2005 the community college system "work force will reflect proportionately the adult population of the state." (*Connerly,* at p. 59.)

The court held that having "overall and continuing hiring goal[s]" of making a given workforce "proportionately reflect the adult population of the state" was a violation of Proposition 209. (*Connerly, supra,* 92

Cal.App.4th at p. 59.) The "goal of assuring participation by some specified percentage of a particular group merely because of its race or gender is 'discrimination for its own sake' " and contravened both Proposition 209 and the state's equal protection clause. (*Connerly, supra,* at pp. 59-61.) The program was not a mere "inclusive outreach" effort because it utilized the suspect classifications of race, gender and ethnicity. Some groups were "favored" over others, because application processes were structured so that sufficient numbers of that group would end up being hired. (See *id.* at p. 61.)

While the *Connerly* court allowed mere data collection and reporting aspects of all the other programs to be severed from those programs and held constitutional, the reporting requirements in the community college program were "entirely bound up and intermixed with the success of the preferential hiring scheme" so that they could not be severed. Hence the community college reporting requirements were held to be unconstitutional. (*Connerly, supra,* 92 Cal.App.4th at p. 61.)

Finally, the *Connerly* court considered one last *reporting* requirement, this one in connection with "participation goals" for state contracts. (*Connerly, supra,* 92 Cal.App.4th at p. 62.) Unlike the reporting requirement for the community colleges, this data collection program could be severed from otherwise discriminatory *participation* goals. The reason was that it went to the Legislature's "power of inquiry." (See *Connerly, supra,* 92 Cal.App.4th at pp. 62-63.) The fact that data is "collected and reported" to the Legislature could only be of use to that body for *future* consideration, it is not a "supervisorial device" necessarily intertwined with a discriminatory program. (*Id.* at p. 63.)

III

*Our Case*

The District insists *Hi-Voltage* and *Connerly* are inapplicable to the facts before us. It argues its policy is not analogous to the outreach programs addressed in those cases and characterizes the transfer policy as a permissible *voluntary desegregation program* that neither discriminates nor grants preferential treatment based on race. The District asserts that because "each school has the same general educational program and provides the same educational opportunities," there is no evidence that some students are "disadvantaged" by or "benefit" from the race-conscious transfer policy. (Page 31 of the District's brief.) The District further maintains the policy is simply a race-conscious program that seeks to provide students with equal educational opportunities. We do not agree.

Under the policy, White student open enrollment transfers out of the school and non-White student transfers into the school are limited to a one-for-one basis. The imposition of these restrictions is inconsistent with the freedom of choice that voluntary programs provide. And more importantly, the policy creates different transfer criteria for students solely on the basis of their race. A White student may not transfer from Westminster High School to a different school until a White student chooses to transfer in and fills the void. A non-White student must wait to transfer into Westminster High School until a non-White student transfers out thereby creating essentially a "non-White opening."

Referencing its history, the District asserts Proposition 209 was never intended to eliminate school integration programs. Yet, by its terms, article I, section 31 of the state Constitution, applies to public education. Subdivision (a) of section 31 plainly says that "The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of . . . public education . . . ."

The ballot materials concerning Proposition 209 were quite clear that even race-conscious "desegregation" programs could be affected by Proposition 209. The Legislative Analyst prepared an in-depth analysis. That analysis, as Chief Justice George put it, is precisely "the item in the ballot pamphlet materials that voters are most likely to have . . . consulted as a reliable indicator of the proposition's meaning and effect." (*Hi-Voltage, supra,* 24 Cal.4th at p. 582 (con. & dis. opn. of George, C. J.).) And that analysis had told the voters that " 'the measure could eliminate, or cause fundamental changes to, voluntary desegregation programs run by school districts.' " (*Id.* at p. 584 (conc. & dis. opn. of George, C. J.).) The Legislative Analyst specifically noted that Proposition 209 could affect special funding for " 'designated "racially isolated minority schools" that are located in areas with high proportions of racial or ethnic minorities." (*Hi-Voltage,* at p. 584 (conc. & dis. opn. of George, C. J.), quoting the Ballot Pamp., Gen. Elect. (Nov. 5, 1996) Legis. Analyst's analysis of Prop. 209, at p. 31.)

The District emphasizes the special nature of K-12 public education and we do not underestimate the significance of quality K-12 public education. But while we appreciate the unique value and importance of education (see, e.g., *Brown v. Board of Education* (1954) 347 U.S. 483, 493 [74 S.Ct. 686, 691, 98 L.Ed. 873, 38 A.L.R.2d 1180] ["education is perhaps the most important function of state and local governments"]), it is clear the intention of the voters was that Proposition 209 apply to education. The district's

transfer policy violates Proposition 209, and to the extent it is required by Education Code section 35160.5, the statute does as well.

## IV

### *Equal Protection Considerations*

The District proposes that the transfer policy is required under the equal protection clause of the Constitution of the United States. While there can be no question the United States Constitution prohibits a school district from acting to segregate schools, there is no federal constitutional mandate necessitating the implementation of a proactive program of integration. The United States Supreme Court has made it clear that such a plan is *not required* by the federal equal protection clause.

"Racial isolation" or "imbalance" that is not the result of segregative intent does not require a racially discriminatory "desegregation" plan. (*Dayton Board of Education v. Brinkman* (1977) 433 U.S. 406, 413 [97 S.Ct. 2766, 2772, 53 L.Ed.2d 851] ["The finding that the pupil population in the various Dayton schools is not homogeneous, standing by itself, is not a violation of the Fourteenth Amendment in the absence of a showing that this condition resulted from intentionally segregative actions on the part of the Board."]; *Milliken v. Bradley* (1977) 433 U.S. 267, 280, fn. 14 [97 S.Ct. 2749, 2757, 53 L.Ed.2d 745] [no federal constitutional right to a "particular degree of racial balance or mixing"]; *Swann v. Board of Education* (1971) 402 U.S. 1, 26 [91 S.Ct. 1267, 1281, 28 L.Ed.2d 554] [racial imbalances may result from innocent causes such as the population distribution of a given district]; accord, *Missouri v. Jenkins* (1995) 515 U.S. 70 [115 S.Ct. 2038, 132 L.Ed.2d 63] [federal court had no authority to order the state to fund predominantly non-White school district so as to attract White students from surrounding districts, so that the non-White district would be better balanced].)

The distinction between what is required by the federal equal protection clause, and what may be permitted by it, is critical in this context. The Ninth Circuit Court of Appeals recognized in the absence of de jure segregation there is no constitutionally required obligation to order desegregation. "Racial balancing cannot be the objective of a federal court unless the balancing is shown to be necessary to correct the effects of government action of a racist character." (*Ho by Ho v. San Francisco Unified School Dist.* (9th Cir. 1998) 147 F.3d 854, 865, citing *Freeman v. Pitts* (1992) 503 U.S. 467, 474 [112 S.Ct. 1430, 1437, 118 L.Ed.2d 108].)

With respect to the equal protection provisions of the California Constitution, the District relies, in part, on statements from *Crawford v. Board of*

*Education* (1976) 17 Cal.3d 280 [130 Cal.Rptr. 724, 551 P.2d 28]; *Serrano v. Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], *San Francisco Unified School Dist. v. Johnson* (1971) 3 Cal.3d 937 [92 Cal.Rptr. 309, 479 P.2d 669]; and *Jackson v. Pasadena City School Dist.* (1963) 59 Cal.2d 876 [31 Cal.Rptr. 606, 382 P.2d 878] and other pre-Proposition 209 California cases. But Proposition 209 has undeniably changed the state law. ■ It is a firmly established rule of constitutional jurisprudence that where two constitutional provisions conflict, the one that was enacted later in time controls. (*People v. Adamson* (1946) 27 Cal.2d 478, 486-487 [165 P.2d 3] [1934 constitutional amendment qualified previous inability to comment on defendant's failure to take stand]; *Slavich v. Walsh* (1947) 82 Cal.App.2d 228, 236-237 [186 P.2d 35] [resolving conflict in power of chartered cities under one constitutional provision by looking to other constitutional provisions enacted later in time].)

V

*Conclusion*

■ One can reasonably infer that in enacting Education Code section 35160.5, the California Legislature believed that unrestricted open transfer policies might result in what the literature calls de facto segregation, or at least racial or ethnic imbalance. Yet, despite the presumed legitimacy of the Legislature's motives, we are forced to conclude that the balancing component of Education Code section 35160.5 is in contravention of the state constitution as amended by Proposition 209.

It is not our intention to suggest that there cannot be any "integration plans" under Proposition 209. We stress that an "integration plan" developed by a school board need not offend Proposition 209 if it does not discriminate or grant preferences on the basis of race or ethnicity.

Although our analysis is limited to the facts before us and we answer only the questions presented to us in this appeal, we note other courts have confronted similar issues in different factual contexts and rendered opinions. The benefits of the development of magnet schools has been cited by some courts. "Magnet schools have the advantage of encouraging voluntary movement of students within a school district in a pattern that aids desegregation on a voluntary basis . . . ." (*Missouri v. Jenkins, supra,* 515 U.S. 70, 92 [115 S.Ct. 2038, 2051].) Another version of an "integration plan" described is a program which would assign only a very small geographic area for a student's home school, and fill remaining places in that school's class by an unweighted random lottery. (See *Tuttle v. Arlington County School Bd.* (4th Cir. 1999) 195 F.3d 698, 706.)

We do not dispute the evils of segregated schools and we recognize the potential benefits of attending a racially and ethnically diverse school, but the people have spoken. California Constitution, article I, section 31 is clear in its prohibition against discrimination or preferential treatment based on race, sex, color, ethnicity or national origin. Thus, the racial balancing component of the District's open transfer policy is invalid under our state Constitution.

The judgment is reversed. The trial court is directed to enter a new order denying the District's motion for summary judgment and granting Crawford's motion for summary judgment and to enter a new judgment accordingly.

Crawford shall recover his costs on appeal.

Rylaarsdam, J., and O'Leary, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 28, 2002.