300 F.3d 1120
 James M. FRIERY, Plaintiff-Appellant,
v.
LOS ANGELES UNIFIED SCHOOL DISTRICT; Russ Thompson; Genethia Hudley Hayes; Valerie Fields; Victoria M. Castro; Caprice Young; David Tokofsky; Julie Korenstein; Mike Lansing; Ruben Zacarias, in their individual and official capacities; United Teachers of Los Angeles, Defendants-Appellees, and
Office of Civil Rights; Does 1 through 10, inclusive, Defendants.
 No. 01-56016.
 D.C. No. CV-00-06536-NM/SH.
 United States Court of Appeals, Ninth Circuit.
 Filed August 22, 2002.
 
 Before: O'SCANNLAIN, RYMER, and THOMAS, Circuit Judges.
 ORDER CERTIFYING QUESTIONS TO THE CALIFORNIA SUPREME COURT
 O'SCANNLAIN, Circuit Judge.
 
 
 1
 We certify to the California Supreme Court two questions set forth in Part II of this order. All further proceedings in this case are stayed pending final action by the California Supreme Court, and this case is withdrawn from submission until further order of this court. If the California Supreme Court accepts the certified questions for answer, the parties shall file a joint report six months after the date of acceptance and every six months thereafter advising us of the status of the proceedings.
 
 
 2
 Pursuant to Rule 29.5 of the California Rules of Court, a panel of the United States Court of Appeals for the Ninth Circuit, before which this appeal is pending, certifies to the California Supreme Court questions of law concerning the effect of Article I, Section 31 of the California Constitution on the permissible use of race-conscious criteria in assigning faculty to public schools. The decisions of the California appellate courts provide no controlling precedent regarding the certified questions, the answers to which may be determinative of this appeal. We respectfully request that the California Supreme Court answer the certified questions presented below. Our phrasing of the issues is not meant to restrict the court's consideration of the case. We agree to follow the answers provided by the California Supreme Court.
 
 
 3
 * James M. Friery is deemed the petitioner in this request because he appeals from the district court's adverse ruling on these issues. The caption of the case is:
 
 
 4
 JAMES M. FRIERY, Plaintiff-Petitioner,
 
 
 5
 v.
 
 
 6
 LOS ANGELES UNIFIED SCHOOL DISTRICT; RUSS THOMPSON; GENETHIA HUDLEY HAYES; VALERIE FIELDS; VICTORIA M. CASTRO; CAPRICE YOUNG; DAVID TOKOFSKY; JULIE KORENSTEIN; MIKE LANSING; RUBEN ZACARIAS, in their individual and official capacities;
 
 
 7
 UNITED TEACHERS OF LOS ANGELES, Defendants-Respondents,
 
 
 8
 and
 
 
 9
 OFFICE OF CIVIL RIGHTS; DOES 1 through 10, inclusive, Defendants.
 
 Counsel for the parties are as follows:
 
 10
 For James M. Friery: Richard D. Ackerman, Gary G. Kreep, United States Justice Foundation, 2901 E. Valley Parkway, Suite 1-C, Escondido, California 92027. Telephone: (760) 741-8086.
 
 
 11
 For Los Angeles Unified School District, Russ Thompson, Genethia Hudley Hayes, Valerie Fields, Victoria M. Castro, Caprice Young, David Tokofsky, Julie Korenstein, Mike Lansing, and Ruben Zacarias: Peter W. James, Baker & Hostetler LLP, 333 S. Grand Ave., Suite 1800, Los Angeles, California 90071. Telephone: (213) 975-1600.
 
 
 12
 For United Teachers of Los Angeles: Jesus E. Quinonez, Taylor, Roth, Bush, Geffner & Furley, 3500 W. Olive Ave., Suite 1100, Burbank, California 91505. Telephone: (818) 955-6400. (United Teachers of Los Angeles joined in the brief filed by the other appellees and did not participate in oral argument.)
 
 II
 The questions of law to be answered are:
 
 13
 1. Does a school district "discriminate ... or grant preferential treatment ... on the basis of race," within the meaning of Article I, Section 31(a) of the California Constitution, when it implements a policy that forbids teachers from transferring between schools where such a transfer would push the ratio of white to nonwhite faculty at the destination school beyond a prescribed balance?
 
 
 14
 (a) If the answer to Question 1 is "yes," is such a policy nonetheless permissible under Article I, Section 31(a) if the school district adopts it in furtherance of its affirmative duty under the California Constitution to remedy de facto segregation? (b) If the answer to Question 1 is "yes," is such a policy nonetheless permissible under Article I, Section 31(a) if it gives a school district administrator discretion to depart from the racial balancing requirement for certain race-neutral reasons?
 
 
 15
 2. Does a policy promulgated as part of a school district's constitutionally mandated desegregation program fall within the "court order" exception of Article I, Section 31(d) of the California Constitution if the pertinent court order (a) approves, with modifications, the overall desegregation program as compliant with the district's constitutional duty; (b) does not mention the specific policy in question; and (c) otherwise terminates court supervision over the district's desegregation efforts? If so, do subsequent amendments to such a policy also fall within the "court order" exception if they are promulgated unilaterally, without court instruction, imprimatur, or involvement, and ratified or re-ratified after the effective date of Article I, Section 31?
 
 III
 The statement of facts is as follows:
 
 16
 James M. Friery was at all relevant times a physical education teacher at Van Nuys High School, an organ of the Los Angeles Unified School District (LAUSD). Friery sought to transfer to a vacant position, identical in pay to his current job, at Van Nuys Math/Science Magnet School, located on the same campus. Russ Thompson, who was then the principal of Van Nuys High, told Friery that he could not successfully transfer to the magnet school because he was "of the wrong ethnic origin." Friery is white.
 
 
 17
 Thompson's statement was based on LAUSD's Transfer Policy ("the Policy"), which bars intradistrict faculty transfers that would move the destination school's ratio of white faculty to nonwhite faculty too far from LAUSD's overall ratio. Versions of the Policy have been in place for about 20 years, but the current incarnation was adopted in 1997; it does not apply to hiring or firing, but only to "assignments, displacements and transfers of teachers." Under the Policy, both ordinary secondary schools (like Van Nuys High) and magnet schools (like Van Nuys Magnet) may deviate up to 15 percentage points below or 25 percentage points above the overall percentage of minority faculty. Thus, because in 1999, 51% of LAUSD's K-12 and magnet school teachers were minorities, the faculty of Van Nuys Magnet could permissibly be as high as 76% minority or as low as 36% minority. The Policy also provides that "the goals may be modified as a result of the qualifications of available applicants or to meet the instructional needs of students, the school's instructional program or other specific and demonstrable requirements of the school."
 
 
 18
 Based on Thompson's statement, Friery did not formally apply for the transfer he desired. Instead, he filed suit in the U.S. District Court for the Central District of California. He named as defendants Thompson; LAUSD, its superintendent, and the members of its governing board; the union representing the district's teachers, with whom the district had negotiated the Transfer Policy; and a federal agency that was later dismissed from the action. Friery alleged, inter alia, that the Policy violated Article I, Section 31 of the California Constitution.
 
 
 19
 The district court granted summary judgment to the defendants, concluding (in pertinent part) that the Transfer Policy did not violate Section 31. First, the court held that the Policy did not discriminate or give preferential treatment on the basis of race, as it "did not discriminate against any racial group" or "establish a preference for one race of teachers over another." It also pointed to LAUSD's duty under the state Constitution to take affirmative steps to alleviate de facto segregation. Finally, the court relied on subsection (d) of Section 31, which provides that Section 31 leaves unaffected any preexisting court order or consent decree. The court concluded that LAUSD had adopted the original Policy in response to a court order directing LAUSD to "implement a reasonably feasible desegregation plan," and that the record did not indicate that the state desegregation order had terminated in 1993, when the Office of Civil Rights of the U.S. Department of Education ended its oversight of LAUSD, or at any other time. Thus, the district court determined that even if Section 31 were applicable, the Policy was permissible under the "court order" exception of subsection (d).
 
 
 20
 Friery filed a timely appeal to this court.
 
 IV
 
 21
 We respectfully request that the California Supreme Court provide authoritative answers to the certified questions for the following reasons:
 
 
 22
 * Article I, Section 31 of the California Constitution provides that instrumentalities of the State of California, including any school district, "shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of ... public education." The California Supreme Court has construed this provision only once, and has never had the opportunity to pass on Section 31's applicability to a program like LAUSD's Transfer Policy, under which a race-based restriction on the availability of a position, opportunity, or benefit applies only at the margins of a set range and, at least on its face, may benefit either whites or nonwhites.
 
 
 23
 Indeed, the California appellate courts have rendered only a few decisions construing Section 31, and none has established at what level a reviewing court is to examine whether a government program discriminates or gives preferential treatment: overall, or from the perspective of an individual applicant? Both the California Supreme Court and, more recently, the Third District Court of Appeal have examined Section 31's impact on programs intended to benefit women and minorities exclusively, i.e., programs that established minimum levels for outreach to or participation by members of those groups. See Hi-Voltage Wire Works, Inc. v. City of San Jose, 24 Cal.4th 537, 563, 101 Cal. Rptr.2d 653, 672, 12 P.3d 1068, 1085 (2000) (striking down public contracting provisions that required granting preferential treatment to businesses that were owned by minorities or women, and discriminating against businesses that were not); Connerly v. State Personnel Bd., 92 Cal. App.4th 16, 112 Cal.Rptr.2d 5, 34, 37, 39-40 (2001) (invalidating various provisions requiring the "selective dissemination of information" to favored groups and granting minorities and women preference in hiring). Because those programs' overall effect was explicitly to favor racial minorities and women on the basis of race or sex, the cases do not provide clear guidance on how the California courts would treat a policy like the one here, which erects both a minimum and a maximum applicable to each racial group, such that the policy's macroscopic effect — keeping whites and nonwhites in balance — touches both groups with equal force, whereas its microscopic effect — denying a transfer to a teacher who would upset that balance — operates to exclude an individual from a position based on his race.
 
 
 24
 One recent Court of Appeal decision has examined a program whose effort to maintain racial balance in a school district impacted both minorities and nonminorities. In Crawford v. Huntington Beach Union High School District, 98 Cal.App.4th 1275, 121 Cal.Rptr.2d 96 (2002), the defendant school district had implemented a policy limiting transfers by white students out of a particular high school and by nonwhite students into that school. Id. at 102. The Court of Appeal held that the transfer policy was unconstitutional under Section 31, rejecting the district's contention that the policy neither discriminated nor granted preferential treatment based on race. Id. However, Crawford v. Huntington Beach is not squarely controlling, because the Huntington Beach school district's policy operated only in one direction: it created a floor for whites and a ceiling for nonwhites, but not the converse. The California courts may treat this as a significant distinction.
 
 
 25
 An additional aspect of LAUSD's Policy has never been addressed by the California appellate courts and thus militates in favor of certification. No published California decision appears to discuss whether the existence of discretion to depart from admittedly race-based standards prevents the discrimination that a program works or the preferential treatment that it grants from being done "on the basis of race" within the meaning of Section 31. Connerly held that if a statute is facially discriminatory, the exercise of discretion in enforcing that statute cannot save it, see Connerly, 112 Cal.Rptr.2d at 32, but the court did not consider whether writing discretion directly into the challenged program would allow it to pass muster.
 
 B
 
 26
 LAUSD points to the existence of a duty under the state Constitution to take affirmative steps to remedy de facto segregation. See Crawford v. Bd. of Educ., 17 Cal.3d 280, 288-91, 130 Cal.Rptr. 724, 729-30, 551 P.2d 28, 33-34 (1976); Jackson v. Pasadena City Sch. Dist., 59 Cal.2d 876, 882 & n. 1, 31 Cal.Rptr. 606, 610 & n. 1, 382 P.2d 878, 882 & n. 1 (1963). Indeed, LAUSD promulgated an earlier version of the Transfer Policy in response to its obligation under those cases.
 
 
 27
 The Court of Appeal's recent decision in Crawford v. Huntington Beach may run contrary to that view. That opinion indicates that with the addition of Article I, Section 31 to the California Constitution, even if a school district remains under a duty to preserve racial balance in its schools, it may not do so by means that amount to race-based "discrimination" or "preferential treatment." See Crawford v. Huntington Beach, 121 Cal.Rptr.2d at 104 (holding that "Proposition 209 has undeniably changed the state law" embodied by the Crawford v. Board of Education and Jackson line of cases, because "[i]t is a firmly established rule of constitutional jurisprudence that where two constitutional provisions conflict, the one that was enacted later in time controls"); see also Hi-Voltage, 24 Cal.4th at 566, 101 Cal.Rptr.2d at 674, 12 P.3d at 1086-87 ("[W]e have concluded the `something more' the voters intended [in approving Proposition 209] was essentially a repudiation of the decisional authority that permitted such discrimination and preferential treatment, notwithstanding antecedent statutory and constitutional law to the contrary.").
 
 
 28
 Although the Crawford v. Huntington Beach may be instructive, we believe that the safer course is to seek an authoritative resolution of this question from the California Supreme Court. We are, after all, bound by the decisions of the California intermediate appellate courts only to the extent that the California Supreme Court would likely reach the same conclusions. See, e.g., FDIC v. McSweeney, 976 F.2d 532, 536 n. 3 (9th Cir.1992). Due to the paucity of case law interpreting Section 31, we believe the preferable course is to request from that court its authoritative answer to this "[n]ovel, unsettled question[ ] of state law." Arizonans for Official English v. Arizona, 520 U.S. 43, 79, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).
 
 C
 
 29
 The same considerations apply with even greater force to the issue of the "court order" exception of Section 31(d). The parties have not pointed us to a single decision by a California appellate court construing this provision, and we have found none.
 
 
 30
 Nor is the answer to the question we face altogether certain from the text of the state constitutional provision or from the facts of our case. The court order on which LAUSD relies in seeking to invoke subsection (d)'s exception is the order that terminated the Crawford v. Board of Education litigation. The Superior Court issued that order in furtherance of a 1980 ruling by the Court of Appeal, Crawford v. Bd. of Educ., 113 Cal.App.3d 633, 170 Cal. Rptr. 495 (1980), aff'd, 458 U.S. 527, 545, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982), which we discuss briefly by way of preamble.
 
 
 31
 The Court of Appeal held that although there was no de jure segregation — and hence no violation of the federal Constitution — in LAUSD's assignment of pupils to schools, id. at 504, 506, the district remained under a state constitutional obligation "to undertake reasonably feasible steps to alleviate school segregation regardless of cause," id. at 506-07. The Court of Appeal directed the trial court to "supervise the preparation and implementation of a reasonably feasible desegregation plan" by the school board, or in the absence of such a plan, to implement one itself. Id. (It instructed the trial court to refrain from the use of mandatory busing, which was not required by the federal Constitution and which could not be imposed by state courts under a recent amendment to the state constitution. Id. at 507.)
 
 
 32
 On remand, the district did submit a desegregation plan, obviating the need for the district to order one. See Crawford v. Bd. of Educ., 200 Cal.App.3d 1397, 246 Cal.Rptr. 806, 811 (1988) ("Upon remand, the District submitted a new desegregation plan (Plan IV) which relied entirely on voluntary reassignment of students."). The Superior Court responded by issuing an order, which is not published and did not appear in the district court record in this case, but which the parties have since lodged with this court.
 
 
 33
 The Superior Court approved the district's plan. Crawford v. Bd. of Educ., No. 822-854, at 7 (Cal.Super.Ct. Sept. 10, 1981) (Order Re Final Approval of School Board Desegregation Plan and Discharge of Writ of Mandate). It made seven modifications, dealing with school construction, terminology, publicizing transfer options, and the compilation of data. Id. at 4-7. The only modification pertaining to faculty was a requirement that "[t]he pupil-teacher ratio in predominantly Hispanic, Black, or Asian and Other schools operated under this plan ... be maintained at 27:1 or less." Id. at 6.
 
 
 34
 With those modifications, the court found that "[t]he time ha[d] come to end these proceedings," because LAUSD had "satisfied the mandate of the Court ... interpreted in light of the [California appellate courts' subsequent Crawford opinions]." Id. at 7, 8. The court accordingly ordered the writ of mandate discharged, and it vacated all of its own outstanding orders, except those pertaining to court monitors. Id. at 8. The court "retain[ed] jurisdiction for the sole purpose of determining the matter of attorney's fees." Id.; see Crawford, 246 Cal.Rptr. at 811; see also id. at 811 n. 3 ("Although both plaintiffs and UTLA [the teachers' union] appealed the trial court's September 1981 order, the parties ultimately dismissed their appeals.").
 
 
 35
 It therefore appears that LAUSD promulgated the original version of the Policy at issue in this case as part of the plan that satisfied its obligation under the Court of Appeal's decision in Crawford v. Board of Education, but not at the express instruction of that court or the Superior Court. Although the Superior Court issued an order approving LAUSD's plan, presumably including the Policy, it did so while simultaneously ending its own supervisory role, and it made no mention of the Policy. Moreover, the Court of Appeal's mandate implemented an earlier decision of the California Supreme Court, which appeared to draw a distinction between a desegregative step voluntarily adopted by a school board and one ordered by a state court. See Crawford v. Bd. of Educ., 17 Cal.3d at 304, 130 Cal.Rptr. at 741, 551 P.2d at 45.
 
 
 36
 We therefore cannot say with any certainty whether the court order terminating the Crawford litigation is one that would qualify the original LAUSD transfer policy for exemption under Section 31(d). Moreover, the Transfer Policy was ratified or re-ratified in 1997, after the effective date of Section 31, see Cal. Const. art. II, § 10. And there is no indication that the modifications were required, requested, or approved by any court. Thus, even were we certain that the original policy could shelter within the exemption of Section 31(d), we would remain unsure as to whether this post-Proposition 209 successor policy would receive derivative protection by "relating back." Accordingly, we respectfully request resolution of this question by the California Supreme Court as well.
 
 D
 
 37
 We add, as a final note, that our precedent requires us to resolve Friery's state constitutional challenge before turning to his claim that the Transfer Policy violates the federal Constitution. See, e.g., Clark v. City of Lakewood, 259 F.3d 996, 1016 n. 12 (9th Cir.2001). The California Supreme Court's resolution of these certified questions therefore has the potential to be entirely determinative of this action.
 
 E
 
 38
 Because neither the decisions of the California Supreme Court nor those of the California Courts of Appeal answer these important questions, we respectfully request an authoritative resolution from the California Supreme Court. Where, as here, a school district's desegregation plan was originally prompted by state constitutional requirements, we believe that the continuing viability of such a plan following amendments to the state constitution poses a sensitive question of state law that is more appropriately decided by the courts of California than by a federal court of appeals.
 
 V
 
 39
 The Clerk of Court is hereby directed to transmit forthwith to the California Supreme Court, under official seal of the Ninth Circuit, a copy of this order and request for certification and all relevant briefs and excerpts of record (including the parties' lodging received June 24, 2002) pursuant to California Rule of Court 29.5(c).
 
 
 40
 IT IS SO ORDERED.